# United States Court of Appeals
## For the First Circuit

No. 13-2292

UNITED STATES OF AMERICA,

Appellee,

v.

CLETUS E. DAVIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Kayatta, Baldock,[*] and Selya,
Circuit Judges.

Jeffrey W. Langholtz on brief for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

December 9, 2014

---

[*]  Of the Tenth Circuit, sitting by designation.

**BALDOCK, Circuit Judge.** A federal grand jury indicted Defendant Cletus Davis on one count of being a felon in possession of two firearms in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Defendant filed a motion to suppress. He moved to suppress the firearms as products of an unlawful search of his residence. He also moved to suppress a statement he made while in transport to the county jail regarding the presence of the firearms in his residence. The district court in an oral ruling denied Defendant's motion to suppress. Thereafter, Defendant entered a conditional plea of guilty pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving the right to appeal the denial of his motion. At sentencing, the district court, over Defendant's objection, found he qualified as an armed career criminal under 18 U.S.C. § 924(e), and sentenced him to the mandatory minimum fifteen years in prison.

Defendant now appeals both his conviction and sentence. In challenging his conviction, Defendant no longer contests the validity of the search itself under the Fourth Amendment. Rather, Defendant now argues that two statements he made regarding the presence of firearms inside the residence should be suppressed under the Fifth Amendment based on alleged Miranda violations. As noted above, Defendant objected to only one of those statements in the district court. As for his sentence, Defendant continues to object to being labeled an armed career criminal. Exercising

-2-

jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291, we affirm.

## I.

The following facts, taken from the transcript of the suppression hearing, are consistent with the district court's oral findings. Robert Omiecinski is a state probation officer in Maine. In April 2011, Officer Omiecinski was supervising Defendant. Defendant was on state probation as a result of felony convictions for unlawfully "furnishing and trafficking in prison contraband." Defendant's conditions of probation included the following: (1) "[a]nswer all questions by your probation officer and permit the officer to visit you at your home or elsewhere," (2) "not own, possess or use any firearm or dangerous weapon," and (3) "submit to random search and testing for drugs at the direction of a probation or law enforcement officer."

On April 5, 2011, Defendant was released from prison after serving time for a probation violation, and he went to live with his girlfriend, Elizabeth Hicks, in Wales, Maine. That same day, Officer Omiecinski received a phone call from Hicks' mother. She advised Omiecinski that "there were guns and drugs" at her daughter's residence. Omiecinski decided to conduct a "home visit, a probation check" the next day to "investigate and find out what the situation was."

Officer Omiecinski contacted Chris Libby, another state

probation officer, for assistance in conducting the planned visit to Hicks' residence. He also contacted the local sheriff's office for assistance. Omiecinski informed Sergeant Rielly Bryant that safety concerns prompted him to request the assistance of uniformed officers. Omiecinski testified that Defendant's criminal history included "an armed standoff prior to his probation. Knowing there potentially were guns [and] drugs in the house, for officer safety I wanted as much manpower as possible in case something went wrong."[1] Omiecinski, Libby, and Bryant agreed they would go to Hicks' residence and, for safety reasons, place Defendant "into restraints" as soon as they made contact with him.

On April 6, 2011, Omiecinski, Libby, Bryant, and Deputy Travis Lovering, also with the sheriff's department, arrived at Hicks' residence. Officer Libby, who knew Hicks, knocked on the door. Hicks answered. Libby identified himself, asked if Defendant was present, and told Hicks they wanted to search the home. Hicks invited the four inside. Defendant, who was in the kitchen, acknowledged Officer Omiecinski. In the house with Defendant and Hicks were her three children and her mother. According to

---

[1] In 2010, Libby was supervising a female probationer with whom Defendant was living at the time. At some point that year, Libby received information indicating Defendant "was abusive and that he dealt drugs and there was a gun and some knives" in the probationer's residence. After a three-hour standoff with Defendant and the probationer, authorities gained access to the residence and located a "big bag" of cocaine in a vacuum cleaner and a gun in a safe under Defendant's control.

Sergeant Bryant, Hicks' mother "asked for permission to be able to remove the children from the home and [the officers] quickly granted" her request. Omiecinski approached Defendant and told him: "I'm going to place you in restraints and handcuffs for my safety. I'm here to do a probation check and we're going to do a search . . . ." Omiecinski also informed Defendant "he was not under arrest," and if everything checked out okay he would be "free to go." Omiecinski then handcuffed Defendant. By all accounts, Defendant was "extremely cooperative" throughout the encounter.

Officer Omiecinski asked Defendant if any firearms were inside the home. Defendant responded that a .22 rifle could be found in the bedroom belonging to one of the children. Omiecinski asked Hicks the same question. Hicks, who also was cooperative throughout, responded that another rifle was in the bathroom off the master bedroom. Omiecinski and Lovering remained with Defendant while Libby and Bryant searched for the firearms. Officer Libby retrieved "an M44" Polish rifle from the bathroom. Sergeant Bryant retrieved a .22 caliber rifle from the child's bedroom. Bryant asked Hicks if she had ammunition for the .22 caliber rifle. Hicks removed some .22 caliber ammunition from the dresser drawer. Hicks told Libby that she had no ammunition for the M44 rifle. Omiecinski then informed Defendant that he was under arrest. Bryant escorted Defendant, who remained handcuffed, to his squad car for transport to the sheriff's station.

-5-

At this point, none of the officers had provided Defendant a Miranda warning. Sergeant Bryant testified that "[m]y intention was to go to the jail and advise him of his rights and record any conversation that we had." After Bryant informed Defendant of his intention, Defendant "indicated that he would want to discuss with his attorney prior to talking to me." In response to the question of whether he and Defendant "exchange[d] any small talk" en route, Bryant stated: "Yes. We had a brief discussion. I talked about —it's a general question I usually ask when somebody is on probation, how much time they have that's possibly over their head remaining, those types of questions, whether he was working or anything at that particular point in time."

When asked whether Defendant made any statements about the rifles during their conversation, Sergeant Bryant again responded yes: "At one point during the transport he uttered a statement that maybe it was apparent that he was angry at his fiancé because he knew the firearms were in the house and she was . . . supposed to get those out of the house." Bryant testified Defendant's statement was not in response to any question he asked. And Bryant did not respond to Defendant's statement. Bryant explained: "I knew that [Defendant] did not want to talk to me about the case itself and he had not been issued his Miranda warning at that point so I wasn't going to further any questioning into that unless he had been read Miranda and changed his mind."

-6-

II.

We first address Defendant's conviction. In doing so, we assume some familiarity with <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), and its progeny. The Fifth Amendment requires police to provide a criminal suspect a <u>Miranda</u> warning before subjecting him to "custodial interrogation." <u>See</u> <u>Dickerson</u> v. <u>United States</u>, 530 U.S. 428, 432 (2000). Otherwise, any incriminating statement a suspect makes as a result of such interrogation may be inadmissible at trial. <u>See</u> <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 297 (1980). The ultimate question of whether an interrogation is "custodial" is a mixed question of law and fact and, where preserved by proper objection in the district court, subject to <u>de</u> <u>novo</u> review. <u>United States</u> v. <u>Fernandez-Ventura</u>, 132 F.3d 844, 846 (1st Cir. 1998). This standard "is not applied mechanically, but in view of the totality of the circumstances." <u>Id.</u> Similarly, "the determination as to whether police 'interrogation' occurred [at all] depends on the totality of the circumstances, a balancing analysis commonly considered amenable to plenary review" where, as here, the underlying historical facts are not in dispute. <u>United States</u> v. <u>Taylor</u>, 985 F.2d 3, 7 n.5 (1st Cir. 1993).

A.

We initially consider the statement to which Defendant objected in the district court, that is, the statement about the rifles Defendant made to Sergeant Bryant during transport to the

-7-

sheriff's station. The district court ruled such statement was not the product of "interrogation":

> [I]t is conceded that the defendant was under arrest and was in custody and the question is whether . . . the single statement was the product of an interrogation, [or] was a volunteered statement, that statement to the effect that [Defendant] was angry at his girlfriend because he knew there were guns in the house and she was supposed to get rid of them.
>
> I find, based on the evidentiary record, that was a volunteered statement. It was not a response to a question. . . . [I]t would be too much speculation, based on the record here, to conclude that really it was a coy or devious procedure by the police officer to acquire that information.
>
> I do not agree that [Defendant's statement] flows from the question of how much time do you have left on probation, are you working, family questions and so I find that [the statement] is not the product of custodial interrogation.

Undoubtedly, Defendant was "in custody" at the time he made his statement to Sergeant Bryant. Officer Omiecinski earlier had informed Defendant of his arrest based upon probable cause. But "the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." Innis, 446 U.S. at 300. "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Id. at 300-01 The "functional equivalent" of questioning is "any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. "[T]he

mere fact that a police officer may be aware that there is a possibility that a suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation." Taylor, 985 F.2d at 8 (internal quotation marks omitted).

The district court concluded, based on the totality of the circumstances, that the brief conversation between Defendant and Sergeant Bryant, during which Bryant asked Defendant a few general questions about his status, was not the impetus for Defendant's subsequent statement regarding the presence of firearms in Hicks' home. We agree that nothing in the record suggests a reasonable officer under these circumstances would have understood that general questions directed at Defendant's status prior to his arrest would elicit Defendant's comment regarding his anger towards Hicks for failing to remove the rifles from the home. Defendant remained calm from the outset of the ordeal. He exhibited knowledge of the criminal justice system when he told Bryant prior to commenting about the rifles that he wanted to speak with an attorney before talking to him at the police station. We cannot say a reasonable officer in Sergeant Bryant's position would have anticipated Defendant's comment as a result of their exchange. Cf. Innis, 446 U.S. at 302 n.8 (recognizing that an officer's knowledge "concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in

determining whether the [officer] should have known that [his] words or actions were reasonably likely to elicit an incriminating response"). Accordingly, because Sergeant Bryant's questions during that exchange did not constitute the "functional equivalent" of interrogation, Defendant's statement made during transport to the sheriff's station did not violate his Fifth Amendment right to be free from self-incrimination.

## B.

Next we consider the statement to which Defendant did not object in the district court. Defendant did <u>not</u> move to suppress the initial statement he made to Officer Omiecinski regarding the rifle in the child's bedroom.[2] At best then, our review of this belated challenge is for plain error. "Plain error is a very stiff standard that is famously difficult to meet." United States v. Rodriquez, 759 F.3d 113, 118 (1st Cir. 2014) (internal citation, quotation marks, and ellipsis omitted). To meet this "rigorous standard," Defendant "must identify: 1) an error 2) that was clear and obvious 3) that affected his substantial rights, and

---

[2] In his written motion to suppress, Defendant did not challenge the admissibility of his statement to Omiecinski. At the suppression hearing, Defendant confirmed the absence of any challenge to this statement. The district court asked Defendant's counsel "which statements are you concerned with?" Counsel responded: "There is one statement I'm concerned about primarily which is the statement made in [Sergeant Bryant's] car. There is tangentially the statement that's later made at the jail about use of the drugs, but I don't see any real relevance of that to this case."

4) that seriously impaired the fairness, integrity, or public reputation of the judicial proceeding." United States v. Farrell, 672 F.3d 27, 29 (1st Cir. 2012).

Here, we bypass the initial question of whether Defendant was "in custody" for purposes of Miranda at the time he answered Officer Omiecinski's inquiry about the presence of firearms in the home, and proceed to the plain error standard's latter three requirements. To satisfy the standard's second requirement, Defendant must show that any error was clear and obvious under the established law at the time of our consideration. Id. at 36. To satisfy the standard's third requirement, Defendant must establish prejudice or, in other words, an error that "likely affected the outcome of the district court proceedings." Rodriquez, 759 F.3d at 118 (emphasis in original) (internal quotation marks omitted). Finally, under the fourth requirement, any error that is plain and affected Defendant's substantial rights must have caused a miscarriage of justice. Id. (noting that we have used the phrases "caused a miscarriage of justice" and "seriously undermined the integrity or public reputation of judicial proceedings" interchangeably).

### 1.

We first ask whether any error the district court may have committed in failing to suppress Defendant's statement to Officer Omiecinski was plain. In Miranda, the Supreme Court described

"custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. We have said that the level of physical control officers exercise over a suspect "carries the most weight" in determining whether such suspect was "in custody" at the time of interrogation. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007). To be sure, when Omiecinski handcuffed Defendant, he deprived Defendant of his freedom of action, thereby exercising a significant degree of physical control over him. See id. (identifying some factors that inform the "in custody" question as 1) where the suspect was questioned, 2) the number of officers present, 3) the degree of physical restraint placed upon the suspect, and 4) the character of the interrogation). But, we have never held that the use of handcuffs necessarily renders a probationer in custody for Miranda purposes. Nor has the Supreme Court so held.

Notably, our sister circuits appear divided on the issue of whether the use of handcuffs necessarily renders a criminal suspect in custody for Miranda purposes. Indeed, the D.C. Circuit recently referred to the question (without answering it) of whether the use of handcuffs renders a suspect in custody within the meaning of the Fifth Amendment as a "constitutional thicket." United States v. Brinson-Scott, 714 F.3d 616, 621 (D.C. Cir. 2013) ("The parties

focus their arguments on the significance of the handcuffs, an issue about which some of our sister circuits have reached opposite conclusions." (citing cases)); see also Oregon v. Elstad, 470 U.S. 298, 309 (1985) (recognizing that "the task of defining 'custody' [for Miranda purposes] is a slippery one").

Making the question still more problematic is the fact that this case arises in a probationary context where a condition of Defendant's probation required him to answer his probation officer's questions in the course of what undoubtedly was a lawful home visit. Moreover, Officer Omiecinski told Defendant "he was not under arrest," but merely being placed in handcuffs as a safety precaution, and if everything checked out okay he would be "free to go." "To a greater or lesser degree," probationers "enjoy . . . only conditional liberty properly dependent on observance of special probation restrictions." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) (internal quotation marks, brackets, and ellipsis omitted). Surely a probationer suspected of recidivism has no more rights than the ordinary criminal suspect referred to by the D.C. Circuit.[3]

---

[3] A reported case presenting a factual scenario somewhat similar to ours is United States v. Newton, 369 F.3d 659 (2d Cir. 2004). In that case, the Second Circuit, applying de novo review, held a parolee was "in custody" for Miranda purposes. The court identified "the handcuffs" as the "problematic factor." Id. at 675. The court deemed the presence of three parole officers and three police officers relatively insignificant. The court's discussion, however, at least partially distinguishes that case from this one:

Fortunately, under plain error review we need not decide whether Defendant was "in custody" for purposes of Miranda when he informed Officer Omiecinski about the rifle in the child's bedroom. We need only conclude that whether Defendant was "in custody" for purposes of Miranda at the time he answered Omiecinski's inquiry about the presence of firearms in the home is subject to reasonable debate under the present state of the law, making the answer far from clear or obvious. Accordingly, any Fifth Amendment violation that may have occurred when Omiecinski failed to administer Defendant a Miranda warning prior to questioning him about firearms in the residence was not plain.

2.

Furthermore, we fail to see how any violation of Defendant's Fifth Amendment right to be free from self-incrimination prejudiced Defendant or constituted a miscarriage of justice as demanded by the third and fourth requirements of the plain error standard

---

The record does not indicate whether Newton was told that the specific reason for a safety concern in his case was that the officers were searching for a gun. Thus, we cannot assume that a reasonable person in his situation would have understood that the handcuffing would likely last only until the officers had completed their search. Neither can we assume an understanding that removal or maintenance of the handcuffs depended on the outcome of the search rather than on the suspect's responding to questions posed. . . . [H]andcuffing Newton, though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of Miranda.

Id. at 677 (emphasis added).

respectively.  Here, Defendant's conditions of probation permitted the officers on the scene to search for drugs, a search to which Defendant no longer objects and that undoubtedly would have revealed the presence of the firearms in the home.  Omiecinski's suspicion became all the more real when Hicks, who was not restrained, informed Omiecinski of the rifle in the bathroom off the master bedroom.

Thus, even absent Defendant's statement to Officer Omiecinski, the evidence is quite sufficient to sustain his conviction for possessing firearms in violation of 18 U.S.C. § 922(g)(1).  Just recently in United States v. Ridolfi, 768 F.3d 57, 62 (1st Cir. 2014), we explained in upholding a § 922(g) conviction:

> Constructive possession of a firearm may be established when a person knowingly has the power and intention at a given time of exercising dominion and control over it either directly or through others.  Constructive possession may be sole or joint and does not require actual ownership of the firearm.  However, a person must have actual knowledge of the weapon in order to have constructive possession.

(internal brackets, citations, and quotation marks omitted).

Of course, "mere presence with or proximity to weapons, or association with another who possesses a weapon, is not enough" to sustain a § 922(g) conviction.  Id. at 768 F.3d at 61–62.  To establish Defendant's constructive possession of the firearms inside the residence, he must have had knowledge of those firearms. And while "knowledge can be inferred in some circumstances from control of the area," United States v. Booth, 111 F.3d 1, 2 (1st

Cir. 1997) (per curiam), we need not rely on any such permissible inference in this case. Defendant on the way to the sheriff's station plainly stated to Sergeant Bryant that he knew the firearms were inside the residence. We have already held that this statement did not infringe Defendant's right to be free from self-incrimination. Therefore, we fail to see how the district court's failure to suppress Defendant's initial statement to Officer Omiecinski "affected his substantial rights" or "seriously impaired the fairness, integrity, or public reputation" of his criminal proceedings. Rodriguez, 759 F.3d at 118.

## III.

Next, we turn to Defendant's sentencing and, in particular, his objection to being labeled an armed career criminal and sentenced to a mandatory minimum fifteen years in prison. According to the Presentence Investigation Report, Defendant is an armed career criminal subject to an enhanced sentence pursuant to 18 U.S.C. § 924(e), otherwise known as the Armed Career Criminal Act (ACCA). Among other things, § 924(e)(1) provides that where a defendant (1) is convicted of being a felon in possession of a firearm in violation 18 U.S.C. § 922(g)(1), and (2) has three prior "violent felony" convictions, the defendant shall be imprisoned not less than fifteen years. Subsection (e)(2)(B) defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that "is burglary, arson, or extortion,

involves the use of explosives, or <u>otherwise involves conduct that presents a serious potential risk of physical injury to another</u>."[4] <u>Id.</u> § 924(e)(2)(B)(ii) (emphasis added).

Where the statute of conviction is "indivisible," we employ a "categorical approach" to determine whether such crime constitutes a "violent felony" under the residual clause of subsection (e)(2)(B):

> Under this approach, we look only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction. That is, we consider whether the elements of the offense are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of th[e] particular offender.

<u>James</u> v. <u>United States</u>, 550 U.S. 192, 202 (2007) (internal emphasis, citations, and quotation marks omitted).

Alternatively, where a statute is "divisible," or comprises multiple, alternative versions of a crime not all of which qualify as an ACCA predicate, we apply a "modified categorical approach" to determine which crime formed the basis of a defendant's conviction. <u>See</u> <u>Descamps</u> v. <u>United States</u>, 133 S. Ct. 2276, 2283–85 (2013). Where a defendant has pled guilty, this approach permits us to look beyond the statute of conviction to the indictment, as well as to

---

[4] Defendant's argument that the ACCA's residual clause is void for vagueness is meritless. <u>See</u> <u>James</u> v. <u>United States</u>, 550 U.S. 192, 210 n.6 (2007); <u>United States</u> v. <u>Anderson</u>, 745 F.3d 593, 596 (1st Cir. 2014). <u>But</u> <u>see</u> <u>Derby</u> v. <u>United States</u>, 131 S. Ct. 2858, 2859–60 (2011) (Scalia, J., dissenting from denial of cert.).

any plea agreement and plea colloquy, to determine whether a particular conviction qualifies under the ACCA.  Id.

A.

The § 924(e) predicate to which Defendant objects on appeal arises out of his 2007 Florida conviction for vehicular flight in violation of Florida Statutes § 316.1935(1):[5]

> It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, [1] willfully to refuse or fail to stop the vehicle in compliance with such order, or [2] having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a felony of the third degree . . . .

Defendant does not dispute that the "[r]isk of violence is inherent to vehicle flight," and for good reason.  See Sykes v. United States, 131 S. Ct. 2267, 2274 (2011) (holding Indiana's vehicular flight crime constitutes a "violent felony" under the ACCA). In Sykes, the Supreme Court explained:

> Confrontation with police is the expected result of vehicle flight.  It places property and persons at serious risk of injury.
>
> . . . .  Between the confrontations that initiate and terminate the incident, the intervening pursuit creates

---

[5] The two predicate convictions which Defendant does not object to on appeal are (1) a 2003 Florida conviction for burglary of a dwelling (the record provides no statutory cite), and (2) a 2007 Florida conviction for vehicular flight to elude police in violation of Florida Statutes § 316.1935(2).  Defendant objected to his convictions under both § 316.1935(1) and (2) in the district court as improper predicates under the ACCA, but objects only to his conviction under subsection (1) on appeal.

-18-

high risks of crashes. . . .  It is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others.

Id.  Subsequently, in United States v. Travis, 747 F.3d 1312, 1317 (11th Cir. 2014), the Eleventh Circuit held that "vehicle flight" in violation of Florida Statutes § 316.1935(1) constitutes a crime of violence for purposes of the sentencing guidelines.[6]

B.

Surely the Eleventh Circuit knows more about Florida law than we do.  So instead of making a futile argument that a conviction for vehicular flight under § 316.1935(1) does not constitute a "violent felony" within the meaning of the ACCA, Defendant argues subsection (1) is a divisible statute which may be violated absent vehicular flight under the subsection's second provision.  Without citation to authority, Defendant says a motorist violates the statute by fleeing on foot after having been stopped by police.  And, according to Defendant, because the state indictment under which he was charged does not refer to vehicular flight, his conviction under subsection (1) does not constitute a "violent

---

[6] "We have repeatedly noted that the 'substantial similarity' between the definition of 'violent felony' for sentencing enhancement purposes under the ACCA and the definition of 'crime of violence' under the Guidelines' career offender provision [U.S.S.G. § 4B1.2(a)] makes decisions interpreting one phrase frequently persuasive in interpreting the other." United States v. Ramirez, 708 F.3d 295, 301 n.4 (1st Cir. 2013) (internal quotation marks, brackets, and ellipsis omitted).

felony" within the meaning of § 924(e).  We disagree.[7]

To be sure, § 316.1935(1) provides alternative means by which a motorist may violate the statute.  To elude police, the motorist may flee outright, or stop and then flee.  But, as we read the text of the statute, either means is sufficient to qualify as an ACCA predicate because both require <u>vehicular</u> flight.  And that renders the modified categorical approach inapplicable to Defendant's case.  See <u>Descamps</u>, 133 S. Ct. at 2285.  We thus need not address whether fleeing on foot constitutes a "violent felony" under the ACCA.  Absent its first provision, subsection (1) reads:  "It is unlawful for the <u>operator of any vehicle</u>, . . . having stopped in knowing compliance with [the] order [of law enforcement], willfully to flee in an attempt to elude the officer . . . ."  Fla. Stat. § 316.1935(1) (emphasis added).  One who flees on foot surely acts unlawfully but does not do so as the "operator of any vehicle" and therefore does not violate the statute.  See <u>Florida Standard Jury Instruction (Criminal)</u> 28.6 (2013) (recognizing vehicular flight as an element of § 316.1935(1) in all instances).

For all the foregoing reasons, the judgment and sentence of the district court are AFFIRMED.

---

[7] We also disagree with Defendant's argument that prior convictions used to enhance a sentence pursuant to the ACCA must be charged in the indictment.  See <u>United States</u> v. <u>Paladin</u>, 748 F.3d 438, 451–52 (1st Cir. 2014).