# United States Court of Appeals
## For the First Circuit

---

No. 13-2176

UNITED STATES OF AMERICA,

Appellee,

v.

MARK RAZO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

---

Before

Lynch, Chief Judge,
Howard and Barron, Circuit Judges.

---

Jeffrey M. Silverstein, with whom Law Office of Jeffrey M. Silverstein, P.A., was on brief, for appellant Mark Razo.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty, II, United States Attorney, was on brief, for appellee.

---

April 1, 2015

---

**BARRON, Circuit Judge.** At his trial in the federal District of Maine, Mark Razo faced a number of charges relating to drug trafficking. After his conviction on all counts, he received a sentence of 300 months in prison. Razo now asserts various alleged errors both at trial and at sentencing. Finding none that require reversal, we affirm both the conviction and the sentence.

**I.**

Razo was charged with one count of conspiracy to commit a drug trafficking offense under 21 U.S.C. §§ 841(a)(1) and 846 and three counts of criminal use of a communications facility to facilitate a trafficking offense under 21 U.S.C. §§ 843(b) and (d). The jury convicted Razo on all counts. The District Court then sentenced Razo to 300 months of imprisonment on the conspiracy count. The judge also sentenced Razo to 48 months of imprisonment on the three counts of criminal use of a communications facility. That sentence was to be served concurrently with Razo's sentence for the conspiracy count.

This appeal followed. Razo challenges his conspiracy conviction and sentence under the Confrontation Clause. He also brings challenges under the Sentencing Guidelines and Alleyne v. United States, 133 S. Ct. 2151 (2013). Finally, he challenges as improper both the use at trial of certain recorded phone calls and venue in the District of Maine. We discuss the facts relevant to each of the these challenges in the course of our analysis.

**II.**

Razo's primary challenge arises under the Confrontation Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Razo contends to us, as he did below, that the Clause bars the admission of a portion of the testimony of a state chemist, Amy Johnson.

At trial, Johnson testified about the laboratory analysis she performed on a substance seized from one of Razo's co-conspirators, Blanca Ortiz. Johnson testified that her analysis confirmed the substance was pure methamphetamine. And her testimony about the methamphetamine's purity was key to the jury's finding that the conspiracy involved 50 grams of pure methamphetamine. Moreover, the District Court relied on this jury finding at sentencing in finding Razo guilty of an aggravated drug trafficking offense under 21 U.S.C. § 841(b)(1)(A), which carries a statutory maximum of life.

Razo's Confrontation Clause challenge focuses solely on the portion of Johnson's testimony that concerned a "known standard" methamphetamine sample that the state crime lab used to create a reference point for comparison with seized evidence. The state crime lab annually received that sample from a private manufacturer, the Sigma Chemical Company. Members of the crime lab then analyzed the sample to confirm that the lab's "reference

library" accurately reflected the properties of the known standard sample.

Specifically, Razo points to the part of Johnson's testimony in which she states that the state crime lab relied on the manufacturer's assurance that the known standard sample was 100-percent pure. And Razo also points to the part of Johnson's testimony acknowledging that, after testing the seized substance, she compared the results of that testing to results generated through analysis by others at the state crime lab of the known standard sample Sigma had supplied.

Razo thus argues that, contrary to the Confrontation Clause, Johnson's testimony relied on hearsay statements arising out of the analysis and production of that known standard sample, even though the source (or sources) for those statements were not made available for cross-examination. And to support that challenge, Razo relies on the line of authority that begins with Crawford v. Washington, 541 U.S. 36 (2004).

In Crawford, the Supreme Court held that the Confrontation Clause applies to "testimonial" statements, whether made in or out of court. That category, Crawford explains, includes "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect

-4-

to be used prosecutorially." Id. at 51. As further support for his argument, Razo also relies on two recent Supreme Court cases that followed Crawford. There, the Court held that the admission of government testimony about forensic tests performed by non-testifying analysts violated the Confrontation Clause. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011).

But, as the government points out, unlike in either Melendez-Diaz or Bullcoming, the analyst who testified in this case -- Johnson -- did personally perform the forensic testing on the seized evidence and personally compared the results with the analysis of the known standard sample. And while a portion of her testimony did address lab work relating to the known standard sample that she did not perform herself, we conclude that portion presents no Confrontation Clause problem under Crawford or the precedents that followed in its wake.[1]

In demarcating the bounds of the Confrontation Clause, the Supreme Court has only confronted cases where the challenged, out-of-court statements were made in the context of a particular investigation. In this case, by contrast, as Johnson's testimony

_____

[1] In addressing that portion of Johnson's testimony, the parties dispute whether Johnson was explaining the assumptions for her own forensic work or testifying about the accuracy of the other lab work on which she relied. But, as we explain, even if Johnson went beyond merely describing the assumptions on which her own work rested, there was still no Confrontation Clause violation.

-5-

makes clear, the production of the known standard sample, like the analysis of it, occurred prior to and without regard to any particular investigation, let alone any particular prosecution. The analysis and production instead merely established a general reference point that could assist other analysts (like Johnson herself) in determining the nature of evidence seized in connection with a later investigation or prosecution. And while Johnson's testimony recounted her reliance on this reference point, she did not recount any express, formalized statements that arose from its development.

We conclude that these distinctions, in this case, are determinative. To be sure, at a general level, Johnson used the reference point for "the purpose of establishing or proving some fact at trial." Melendez-Diaz, 557 U.S. at 324. Her testimony conveyed reliance on the lab's baseline purity standard and assumed its reliability.

But the record does not show that Johnson described any particular out-of-court statements. And, on this record, we struggle to see how any out-of-court statements that Johnson implicitly relied upon regarding the sample's purity can be described as having been made with "a 'primary purpose' of 'establishing or proving past events potentially relevant to later criminal prosecution.'" United States v. Cameron, 699 F.3d 621, 640 (1st Cir. 2012) (quoting Bullcoming, 131 S. Ct. at 2714 n.6).

Any such statements would have been made when Sigma provided the sample or when the state crime lab's analysts updated the "reference library." Nothing in the Supreme Court's precedents indicates that the term "testimonial" stretches to cover this analyst's implicit reliance on such background, empirically-verifiable statements or representations that were incorporated by the crime lab for use, prospectively, in all future analyses the lab would undertake. Cf. Melendez-Diaz, 557 U.S. at 311 n.1 (suggesting that "documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records").

In consequence, in referencing work related to the known standard sample, Johnson was not testifying about statements made to establish or prove past "events," as has been true in each case Razo invokes to support his challenge. She was instead testifying, at most, about statements (if statements they can be called) that had been used to establish a background reference point for future testing of materials that then would be used to establish or prove such events. And, of course, with respect to that testing, Johnson herself performed it, testified about what she did, and was subject to cross-examination. Thus, to the extent Johnson could be said to have testified to the truth of any such statements by other analysts, those statements were not testimonial under the Crawford line of authority. See People v. Pealer, 985 N.E.2d 903, 907 (N.Y. 2013) ("The fact that the scientific test results and the

-7-

observations of the technicians might be relevant to future prosecutions of unknown defendants was, at most, an ancillary consideration when they inspected and calibrated the machine."); Commonwealth v. Dyarman, 73 A.3d 565, 574 (Pa. 2013) ("[C]alibration and accuracy certificates [for breathalyzer machines] were not prepared for the primary purpose of providing evidence in a criminal case, let alone for the primary purpose of accusing appellant.").

The government adds that the Supreme Court's recent fractured decision in Williams v. Illinois, 132 S. Ct. 2221 (2012), supports this conclusion. And, without addressing how Williams may or may not have changed the primary purpose test under the Crawford line of authority, see, e.g., United States v. James, 712 F.3d 79, 95-96 (2d Cir. 2013), we agree.

Consistent with the test used by the plurality opinion in Williams, statements arising from the analysis and production of the known standard sample were "not prepared for the primary purpose of accusing a targeted individual," Williams, 132 S. Ct. at 2243 (plurality opinion). And, to the extent that a testimonial statement must be a "formalized statement[] bearing indicia of solemnity," as Justice Thomas indicated in his concurrence in Williams, id. at 2261 (Thomas, J., concurring), Razo also has not alleged that any out-of-court statement arising from the analysis or production of the sample so qualified.

-8-

For these reasons, we conclude the Confrontation Clause did not require more than Johnson's presence.  And so Razo's challenge on this score fails.

### III.

Razo also raises a number of objections to his sentence. We review challenges to a district court's legal interpretations of the Sentencing Guidelines de novo.  United States v. Gonzalez, 609 F.3d 13, 20 (1st Cir. 2010).  We review a district court's factual determinations for clear error.  Id.  Challenges to the reasonableness of a sentence are reviewed for abuse of discretion, with respect to both procedural error and substantive reasonableness.  United States v. King, 741 F.3d 305, 307-08 (1st Cir. 2014).  Applying these standards of review as applicable, we find that none of the challenges to Razo's sentence have merit.

### A.

Razo first argues that the District Court erred by giving one of his co-conspirators disparate -- and more favorable -- treatment.  Razo rests this argument on the disparity in what is known under the guidelines as the base offense level, as Razo was assigned a higher one than his co-conspirator.

The base offense level is a key ingredient in the calculation that a district court must make to determine the recommended guidelines sentencing range for a defendant.  Here, the District Court determined that Razo's base offense level was 38

while the base offense level of the co-conspirator in question, Blanca Ortiz, was 34.

The District Court concluded Razo warranted the higher base offense level. The District Court found that Razo, on the basis of facts set forth in the pre-sentence report that the probation office prepared, was responsible for an offense that involved 1,789 grams of pure methamphetamine. By contrast, the District Court found the other defendant, Ortiz, on the basis of facts stipulated in her plea agreement, to be responsible for an offense involving a drug quantity of 1,789 grams of impure methamphetamine. See U.S.S.G. §§ 2D1.1(c)(1), (3) (2010). And the District Court correctly concluded that the base offense level is higher for an offense involving that amount of pure methamphetamine than for an offense involving that amount of the drug when it is not pure.

In treating Razo and Ortiz differently in this respect, the District Court committed no error, even though Ortiz was involved in the same conspiracy involving the same drugs. The District Court explained that Ortiz entered into a plea agreement two days before the prosecutor received the lab report detailing the purity of the methamphetamine. Razo, by contrast, was convicted after a trial in which that evidence of purity had been introduced. The defendant's disparity argument therefore fails, both because it was fully considered by the District Court and

because the District Court reasonably attributed the basis for the difference at issue to the fact that, due to Ortiz having pled, she was sentenced on the basis of a different record than Razo. See, e.g., United States v. Dávila-González, 595 F.3d 42, 50 (1st Cir. 2010) ("While avoidance of disparities among codefendants may be considered, a party is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." (internal quotation marks omitted)); United States v. Rodríguez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009) (describing "material difference" between defendants who pled guilty pursuant to plea agreements and those who did not); United States v. Brandao, 539 F.3d 44, 65 (1st Cir. 2008) (same).

**B.**

Razo next challenges the District Court's four-point upward increase in his total offense level under the guidelines. See U.S.S.G. § 3B1.1(a). The total offense level is calculated by adding points for enhancements to the base offense level. To justify the increase under U.S.S.G. § 3B1.1(a), the District Court found that Razo was a leader in the conspiracy and that the conspiracy involved five or more participants. See United States v. Lucena-Rivera, 750 F.3d 43, 50 (1st Cir. 2014).

The District Court identified five conspirators who were involved with an intercepted shipment of drugs to Iowa as well as additional unnamed suppliers and retailers who had to be involved

in this planned distribution. The record reveals evidence sufficient to show the District Court did not clearly err in so finding. See United States v. Carrero-Hernández, 643 F.3d 344, 352 (1st Cir. 2011).

Similarly, the record refutes Razo's contention that the District Court erred in finding Razo had a leadership role in the conspiracy. The District Court stated that it was "convinced beyond any shadow of a doubt" of Razo's leadership role. The District Court pointed specifically to Razo's role in organizing the activities of the conspiracy and his role in the conspiracy's hierarchy above Barry Diaz, a co-conspirator the District Court described as having "stood over the actual distributors." We see no basis for concluding that these factual findings are so lacking in record support as to be clearly wrong. See United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

### c.

Razo also challenges his designation as a career offender pursuant to U.S.S.G. § 4B1.1. To qualify as a career offender under that guideline, a defendant must have at least two prior felony convictions for a "crime of violence" or a controlled substance offense. See U.S.S.G. § 4B1.1(a). The District Court determined that Razo's prior convictions so qualified him. Razo contends that one of his prior offenses, however, does not constitute a "crime of violence" within the meaning of that

guideline.  And for that reason, he contends that the career offender designation was erroneously applied.

The conviction in question is for violating section 2800.4 of California's Vehicle Code.[2]  Section 2800.4 requires, as a predicate, a violation of section 2800.1 of California's Vehicle Code.  That statute criminalizes flight from a police officer. Section 2800.4 then also requires -- as a necessary element -- that "the person operating the pursued vehicle willfully drives that vehicle on a highway in a direction opposite to that in which the traffic lawfully moves upon that highway."  Cal. Veh. Code § 2800.4.

Given the elements of section 2800.4, Razo's argument is foreclosed by Sykes v. United States, 131 S. Ct. 2267 (2011).  In Sykes, the Supreme Court interpreted the Armed Career Criminal Act's definition of a "violent felony."  That definition is consonant with the career offender guideline's definition of a "crime of violence."  United States v. Hart, 674 F.3d 33, 41 n.5 (1st Cir. 2012) ("The Sentencing Guidelines' term 'crime of violence' and ACCA's term 'violent felony' are defined almost identically.  Accordingly, 'decisions construing one term inform the construction of the other.'" (citations omitted)).  Thus, if

_____

[2] Though the specific statute for the crime of conviction does not appear in the record, Razo and the government point to section 2800.4 of California's Vehicle Code in their briefs, which aligns with the prior offense as described in the pre-sentence report.

-13-

Razo was convicted of an offense that qualified as a "violent felony" under Sykes, he was convicted of an offense that qualifies as a "crime of violence" under the career offender guideline. And Sykes shows that Razo was.

Sykes held that an Indiana statute that criminalized vehicular flight from a police officer was a "violent felony." 131 S. Ct. at 2273, 2277. The California offense at issue here criminalizes a particular type of vehicular flight that is even more dangerous than the type criminalized by the Indiana statute that Sykes concluded was a violent felony. Razo's conviction under the California statute, therefore, necessarily qualifies as a crime of violence under the career offender guideline. See United States v. Davis, 773 F.3d 334, 343 (1st Cir. 2014) ("[T]he risk of violence is inherent to vehicle flight." (quotation marks and alteration omitted)).

As a fallback position, Razo argues that, even accepting that his conviction under Section 2800.4 qualifies as a crime of violence under the career offender guideline, the District Court still imposed an unreasonably harsh sentence. But this claim, too, fails.

At sentencing, a district court is instructed to consider a variety of factors. See 18 U.S.C. § 3553(a). The District Court acknowledged the sentence was stiff, but carefully applied the factors that section 3553 requires the judge to consider. See

Brandao, 539 F.3d at 65. And, after making the individualized assessment of the circumstances of this particular defendant in connection with those factors, the District Court varied downwards from the recommended guidelines sentence. The District Court did so based in part on the fact that Razo had only two prior convictions for crimes of violence. There is thus no basis for concluding that Razo's sentence was substantively or procedurally unreasonable. See United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).

**D.**

Razo raises one other challenge to his sentence on the conspiracy count. He contends the District Court subjected him to a penalty range unauthorized by statute because the District Court impermissibly used the statutory maximum from one part of a statute and the mandatory minimum from another. Razo contends the District Court was obliged to use the minimum and maximum set forth in the same part of the statute and not to mix and match. And further, Razo contends, had the District Court done as required, the District Court would have had to have used a much lower statutory maximum than it did.

Although we conclude there is no merit to Razo's argument, given the facts of this case, it takes a bit of work to explain why. And that is because the challenge rests on some

shifts in the law of sentencing that occurred between the time of trial and the time of sentencing in this case.

We begin with the basics. Razo was charged with conspiracy to commit a trafficking offense under 21 U.S.C. §§ 846 and 841(a)(1). The penalties for a violation of 21 U.S.C. § 841(a)(1) are defined in the subsections of § 841(b)(1). Those subsections provide for a default penalty range, § 841(b)(1)(C), and then higher ranges for aggravated offenses when a certain triggering quantity of drugs is involved, § 841(b)(1)(A), (B).

Against this statutory backdrop, the District Court took the maximum of life from § 841(b)(1)(A) and used a minimum of zero years rather than the much higher minimum from § 841(b)(1)(A). The District Court resorted to this approach -- which Razo calls "mix[ing] and match[ing]" -- because of a change in the state of the law between trial and sentencing.

At the time of trial, First Circuit law based the statutory minimum under 21 U.S.C. § 841 on the quantity of drugs specifically attributable to the defendant, and the statutory maximum on the quantity attributable to the conspiracy as a whole. United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004). At trial, the government had sought to trigger the higher penalty range that § 841(b)(1)(A) established. To do so, the government asked the jury to return a finding that the whole conspiracy involved over 50 grams of pure methamphetamine, or 500 grams of a

-16-

substance containing methamphetamine. The government sought that jury finding because it was established at that time that the lifetime maximum under § 841(b)(1)(A) could be triggered only when the jury returned a finding -- as it did here -- as to what quantity of drugs was encompassed within the entire conspiracy. See Apprendi v. New Jersey, 530 U.S. 466, 491-92 (2000); United States v. Correy, 570 F.3d 373, 377 (1st Cir. 2009).

At that time, however, there was no similar precedent requiring a jury finding in order to apply the aggravated minimum from § 841(b)(1)(A), which is 20 years with a qualifying prior conviction. Instead, a judge could make a finding at the time of sentencing about the quantity of drugs involved in the conspiracy attributable to the individual defendant. See Colón-Solís, 354 F.3d at 103. And so long as the judge found that amount was large enough, the minimum of 20 years (at least for a defendant with Razo's criminal history) would apply. Thus, consistent with the law at the time of trial, the government did not seek, and thus did not receive, a jury finding on that issue.

But, by the time of sentencing, the state of the law had changed as a result of Alleyne v. United States, 133 S. Ct. 2151 (2013). There, the Court held that a jury finding was required to trigger a mandatory minimum. Id. at 2155. And while here, the District Court concluded that Razo was subject to the maximum sentence of life established under § 841(b)(1)(A) because of the

-17-

jury's finding that the conspiracy involved 50 grams of pure methamphetamine, the mandatory minimum for that provision could not be similarly applied. That was because there was no jury finding on the quantity of drugs individually attributable to Razo and Alleyne had just held a jury finding was necessary for an element that triggered a mandatory minimum. And so the judge applied no minimum at all, which in this case was also the result that would have obtained under the default penalty range in § 841(b)(1)(C).

Thus, even assuming Razo is correct to characterize the District Court as having taken the minimum from § 841(b)(1)(C) and the maximum from § 841(b)(1)(A), and even assuming doing so is not permissible, see United States v. Ramírez-Negrón, 751 F.3d 42, 49 n.4 (1st Cir. 2014) (leaving open "whether this asymmetry [in defining the applicable sentencing range] may remain after Alleyne"), we agree with the government that there was no harm to Razo. Here, the use of the maximum of life was supported by a jury finding that the whole conspiracy involved at least 50 grams of pure methamphetamine. And, Razo was not subjected to a minimum that could possibly have caused him any harm, as the minimum applied -- zero years -- was no minimum at all. And while the district judge purportedly applied a statutory maximum of life, that did not harm Razo either. The judge in fact imposed a sentence below the statutory maximum that would have applied to a defendant with Razo's criminal history under the default penalty

range in § 841(b)(1)(C), and nothing indicates that the "theoretical" maximum informed the sentencing determination. See United States v. Robinson, 241 F.3d 115, 119 (1st Cir. 2001) ("[T]heoretical exposure to a higher sentence, unaccompanied by the imposition of a sentence that in fact exceeds the otherwise-applicable statutory maximum, is of no consequence.").

In any event, there also was overwhelming and uncontradicted evidence to support the finding necessary to trigger the higher minimum that was not used but that would apply under § 841(b)(1)(A) -- that the individual was responsible for at least 50 grams of pure methamphetamine. That evidence consists of Amy Johnson's testimony that the drugs seized from Blanca Ortiz were of that quantity and purity and Ortiz's testimony that those drugs originated with one of Razo's suppliers and were transported by a courier arranged and supervised by Razo. And, further, the government presented phone records that revealed that Razo was personally involved in planning the distribution of that shipment of drugs through his co-conspirator Diaz. In fact, Razo points to no evidence contradicting the drug quantities testified to at trial, nor does he assert that he was responsible for a lower quantity. Cf. United States v. Casas, 425 F.3d 23, 66 (1st Cir. 2005). Thus, a "reasonable jury necessarily would have found the aggravating element beyond a reasonable doubt" even though it was not asked to do so here. United States v. Pizarro, 772 F.3d 284,

296 (1st Cir. 2014); see also United States v. Harakaly, 734 F.3d 88, 97 (1st Cir. 2013) ("Because the evidence of the triggering drug quantity was overwhelming, we hold that the Alleyne error was harmless beyond a reasonable doubt.").

For all of these reasons, we thus agree with the government that if there was any error here, it was harmless beyond a reasonable doubt.[3]

**IV.**

Razo presents two remaining challenges. He first contests the admission of certain recorded phone calls during trial. He then contends that Maine was not a proper venue for the trial. Neither challenge is persuasive.

**A.**

Razo objects to the use at trial of unspecified recorded calls the government obtained through wiretaps during the

---

[3] We need not confront Razo's claim that the District Court erroneously used the statutory maximum of life imprisonment under 21 U.S.C. § 841(b)(1)(A) in applying the career offender guideline. See U.S.S.G. § 4B1.1(b) (providing for an alternate base offense level calculation for career offenders, determined from the relevant statutory maximum, but applied only when higher than the ordinary guidelines calculation). As we have already explained, the District Court did not err in calculating Razo's ordinary base offense level at 42, after including the four-point leadership enhancement. This base offense level was determined based on the quantity and type of drug involved in the offense, see U.S.S.G. § 2D1.1(c)(1) (2010), and Razo's role in the offense, see U.S.S.G. § 3B1.1(a), without reference to any statutory maximum. And because this base offense level was higher than the alternate base offense level available under the career offender guideline, the statutory maximum was not, in fact, used.

investigation. Razo argues some of these calls were wrongly admitted under Federal Rule of Evidence 801(d)(2)(E), which states that the out-of-court statements of co-conspirators, made during and in furtherance of the conspiracy, are not hearsay. See United States v. Mitchell, 596 F.3d 18, 22 (1st Cir. 2010). Razo contends that some of the recorded calls were admitted as co-conspirator statements even though they were not made in furtherance of the conspiracy in which he is charged with participating. He argues these out-of-court statements were thus inadmissible under the hearsay rule.

Razo does not specify, however, the non-qualifying calls he has in mind, nor any that were in fact erroneously admitted. And the government contends that in fact no such non-qualifying calls were admitted. Absent Razo identifying the calls he believes should have been excluded for falling outside the co-conspirator exception, we must reject his challenge. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that claims that are not developed on appeal are waived).

## B.

Razo's final challenge concerns venue. Razo was incarcerated in California for the duration of the conspiracy and was not physically present in Maine for any of these offenses. He thus argues the government cannot establish venue in Maine.

Absent certain exceptions not relevant here, the government must prosecute an offense in a district where the offense was committed. Fed. R. Crim. P. 18. But when a crime consists of distinct parts, taking place in different localities, venue is proper wherever any part of that crime can be proved to have taken place. United States v. Scott, 270 F.3d 30, 35 (1st Cir. 2001).

When challenged, the government must prove the required connection between the crime and the venue by a preponderance of the evidence. United States v. Hall, 691 F.2d 48, 50 (1st Cir. 1982). If a defendant appeals a finding that venue was proper, we review legal conclusions de novo and factual findings for clear error. United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004). And, "[f]or purposes of that review, we align the evidence of record in the light most flattering to the venue determination." Id.

The record shows that while Razo was incarcerated in California, he used a contraband cell phone to coordinate a trafficking operation with his co-conspirator Barry Diaz. The record provides support for the fact that Diaz and Razo spoke on the phone while Diaz was in Maine. The evidence further shows that these calls addressed drug distribution in Maine, and that money orders were sent from Diaz in Maine to Razo's contacts in California. Thus, the evidence of Razo's co-conspirator's actions

in Maine suffice to support the jury's venue determination. See United States v. Cordero, 668 F.2d 32, 44 (1st Cir. 1981); see also United States v. Uribe, 890 F.2d 554, 558 (1st Cir. 1989) ("As to the conspiracy charge (count one), it is clear beyond peradventure that venue was proper so long as any act in furtherance of the conspiracy was committed in the district (even if a particular conspirator was not himself physically present there).").

The record also provides sufficient support for finding venue proper as to the three counts for criminal use of a communications facility to facilitate a trafficking offense under 21 U.S.C. §§ 843(b), (d).  Venue has to be proper for each count, as "[t]he criminal law does not recognize the concept of supplemental venue." Salinas, 373 F.3d at 164.  But Razo concedes Diaz used a communication facility in Maine for the calls underlying all three counts. See Andrews v. United States, 817 F.2d 1277, 1279 (7th Cir. 1987) (finding a section 843(b) offense "is committed both where the call originates and where it is received").  And, further, the calls between Razo and Diaz facilitated a drug conspiracy that involved the distribution of drugs in Maine, for which venue in Maine was proper. See United States v. Acosta-Gallardo, 656 F.3d 1109, 1122 (10th Cir. 2011) (finding venue for a section 843 offense proper where venue is established for the underlying trafficking offense).  Thus, Razo's venue challenge cannot succeed.

**V.**

Because we find no reversible error among Razo's many challenges, the judgment of the District Court is <u>affirmed</u>.