# United States Court of Appeals
## For the First Circuit

No. 14-1864

UNITED STATES OF AMERICA,

Appellee,

v.

APOLINAR ORTIZ-ISLAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
and Barron, Circuit Judge.

Benjamin L. Falkner, with whom Krasnoo, Klehm & Falkner LLP
was on brief, for appellant.
Renée M. Bunker, Assistant U.S. Attorney, with whom Thomas E.
Delahanty II, United States Attorney, was on brief, for appellee.

July 11, 2016

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, <u>Associate Justice</u>.  Apolinar Ortiz-Islas appeals his conviction and sentence for conspiracy to possess cocaine for distribution and to distribute it.  We affirm.

**I**

Mathieu LeBlanc orchestrated a cocaine distribution conspiracy that completed a number of transactions beginning in 2010.  He would typically arrange for Robert Rossignol to receive money in Canada and smuggle it across the border into Maine.  LeBlanc then would drive the money to Texas or have others, including Chad Hallett, transport it for him.  Ahead of his and the money's arrival in Texas, LeBlanc would notify Victor Charles and Kyle MacDonnell that he was coming so that they could arrange a meeting between LeBlanc and a cocaine supplier, most frequently Ortiz-Islas.  Charles and MacDonnell would provide protection and logistical support during the transaction.  After the exchange, Hallett or Charles would drive the cocaine from Texas to Maine, where it would be handed off to Rossignol.

In May 2012, Charles was incarcerated for a parole violation, but he sought to preserve his place in the conspiracy even while in custody, by receiving payment on future deals between LeBlanc and Ortiz-Islas in recognition of the logistical groundwork he had helped to lay in the past.  Both LeBlanc and Ortiz-Islas agreed to pay Charles for deals completed while he was locked up.  At one point, Ortiz-Islas contacted Charles's wife to

obtain LeBlanc's phone number, and Charles ensured that LeBlanc and Ortiz-Islas knew how to make contact with each other.

LeBlanc planned to complete a deal in June 2012 and spoke ahead of time directly to Ortiz-Islas, since Charles was in custody. LeBlanc made the plans known to Charles, who requested that his share be paid to his mother. Hallett received the money for the June deal from Rossignol in Maine, and, for this particular trip, was supposed to meet LeBlanc in New Jersey, where they would exchange Canadian currency for American dollars. Hallett then would drive the converted cash to Texas, where he would connect with LeBlanc again. As part of the June deal, Ortiz-Islas agreed to "front" cocaine to LeBlanc: Ortiz-Islas would give LeBlanc more drugs than he paid for on the understanding that LeBlanc would make up the difference in a subsequent transaction.

But the June arrangements went awry. Hallett was arrested driving the cash from Maine and agreed to participate in a controlled delivery of the money to LeBlanc in New Jersey, as planned. LeBlanc was then arrested in New Jersey on June 28 and, like Hallett, agreed to cooperate. He placed recorded phone calls to Ortiz-Islas, fabricating a reason to stall and work out new logistics for what would be a controlled transaction.

While LeBlanc and Ortiz-Islas were still hashing out the details of the delayed deal, on August 16 a grand jury in Maine indicted Rossignol, Charles, and Ortiz-Islas for conspiring "with

persons known and unknown" to distribute and to possess with intent to distribute at least five kilograms of cocaine in "Maine and elsewhere" over a period beginning "no later than January 1, 2011," and continuing until "no earlier than June 28, 2012" (the date of LeBlanc's arrest).

What was supposed to be the June deal ended as a sting operation on September 18. Ortiz-Islas met with a federal agent posing as LeBlanc's courier and was arrested as they approached the location of the planned swap, where cocaine was seized.

Rossignol and Charles, who were included in the indictment alongside Ortiz-Islas, pleaded guilty, as did LeBlanc and Hallett, who were charged separately. MacDonnell received immunity. At Ortiz-Islas's trial, Charles, LeBlanc, Hallett, and MacDonnell testified against him, Charles attesting that on behalf of LeBlanc he made about six trips to Maine transporting cocaine purchased from Ortiz-Islas. The first was said to involve three kilograms, and the quantity on each subsequent trip was at least five. The jury convicted Ortiz-Islas of conspiring to distribute and to possess with intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.

At sentencing, the district court found Ortiz-Islas accountable for almost 34 kilograms of cocaine, which (at the time) gave him a base offense level of 34 under U.S. Sentencing Guidelines Manual § 2D1.1(c)(3) (U.S. Sentencing Comm'n 2013).

- 4 -

The court applied a two-level increase in light of evidence that Ortiz-Islas possessed a gun at some of the drug deals, id. § 2D1.1(b)(1), but varied back downward by two levels at the parties' urging in recognition of impending Guidelines amendments providing two-level reductions in drug-quantity offense levels. An offense level of 34 and a criminal history category of I yielded a Guidelines sentencing range of 151 to 188 months. Id. (sentencing table). The Government recommended a sentence at the top of this range. But taking account of the other conspirators' sentences (Hallett received 48 months, LeBlanc got 104, and Charles and Rossignol 120 each), the court sentenced Ortiz-Islas within the Guidelines range to 170 months' imprisonment. He appealed.

## II

Ortiz-Islas raises four issues, none of them meritorious.

## A

According to him, there was an impermissible variance between the indictment's charge and the Government's proof. While the evidence may have shown that he conspired to sell cocaine to LeBlanc in Texas, he says, it failed to place him in a conspiracy with LeBlanc to distribute the drugs in Maine or elsewhere.

"When a defendant asserts a claim of variance premised on the notion that multiple conspiracies existed and that his activities were not part of the charged conspiracy, the initial

question is one of evidentiary sufficiency." United States v. Ramirez-Rivera, 800 F.3d 1, 46 (1st Cir. 2015) (internal quotation marks omitted) (quoting United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011)). "We review sufficiency challenges de novo. We consider all the direct and circumstantial evidence in the light most flattering to the [G]overnment, 'drawing all reasonable inferences consistent with the verdict . . . to determine whether a rational jury could have found the defendant[] guilty beyond a reasonable doubt.'" Id. at 16 (citations omitted) (quoting United States v. Négron-Sostre, 790 F.3d 295, 307 (1st Cir. 2015)).

"Three factors guide our assessment of whether the evidence was sufficient to prove that a set of criminal activities [constituted] a single conspiracy: '(1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants.'" United States v. Paz-Alvarez, 799 F.3d 12, 30 (1st Cir. 2015) (quoting United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012)). "In considering these three factors, we must remember that the existence of a single conspiracy does not require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy." Dellosantos, 649 F.3d at 118.

Here, all three considerations point to a single conspiracy. The first, existence of a common goal, "is broadly drawn" and in a case like this is satisfied by evidence of a shared "interest in furthering the distribution of drugs." Négron-Sostre, 790 F.3d at 309 (internal quotation marks omitted) (quoting United States v. Portela, 167 F.3d 687, 695 & n.3 (1st Cir. 1999)). That was the common goal here: "namely, to sell drugs for profit." Paz-Alvarez, 799 F.3d at 30. Contrary to Ortiz-Islas's characterization, he had more than a mere buyer-seller relationship with LeBlanc: he was engaging in selling wholesale quantities obviously purchased for further sale, and he was even willing to front cocaine to LeBlanc, an act of trust that assumed an ongoing enterprise with a standing objective.

The second, overlap among the activities' participants, "is satisfied by the pervasive involvement of a single core conspirator." Dellosantos, 649 F.3d at 118 (internal quotation marks omitted) (quoting United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 2009)). Here, LeBlanc fills that bill. He would (i) arrange for Rossignol to smuggle currency from Canada into Maine, (ii) pay Hallett and others to drive the cash to Texas, (iii) inform Charles and MacDonnell of his upcoming arrival in Texas, (iv) meet with Oritz-Islas among others to swap the money for cocaine, and (v) direct Hallett, Charles, and others to transport the drugs back to Maine.

Remarkably, Ortiz-Islas denies that the required overlap occurred, relying on United States v. Monserrate-Valentín:

> [T]he mere fact that a central person (the "hub" of a wheel) is involved in multiple conspiracies (the wheel's "spokes") does not mean that a defendant . . . who participated in a spoke conspiracy . . . may be convicted of participating in an overarching conspiracy encompassing the entire wheel. The [G]overnment must also produce evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy.

729 F.3d 31, 44-45 (1st Cir. 2013) (citation and some internal quotation marks omitted) (quoting United States v. Franco-Santiago, 681 F.3d 1, 11 (1st Cir. 2012), abrogated on other grounds by Musacchio v. United States, 136 S. Ct. 709 (2016)). But this was not a "hub-and-spoke conspiracy," where "one core figure supplies drugs to multiple participants." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009). This, rather, was a chain conspiracy:

> Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants. Accordingly, a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become

involved in all of the activities in furtherance of the conspiracy.

United States v. Giry, 818 F.2d 120, 127-28 (1st Cir. 1987) (quoting United States v. Warner, 690 F.2d 545, 549 (6th Cir. 1982)).

The third consideration, interdependence among the participants, "exists where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Négron-Sostre, 790 F.3d at 309 (internal quotation marks omitted) (quoting United States v. Rivera Calderón, 578 F.3d 78, 89 (1st Cir. 2009)). Among other evidence of interdependence here, Ortiz-Islas contacted Charles's wife while he was incarcerated to get LeBlanc's phone number, thus indicating that LeBlanc's trafficking of cocaine from Texas to Maine was advantageous to Ortiz-Islas's distribution of the product. To the same effect, the conspirators put their unified and continuing enterprise before immediate profit: Ortiz-Islas and LeBlanc each agreed to pay Charles even when his incarceration prevented his customary contribution to the conspiratorial project.

Ortiz-Islas argues contrariwise by pointing to Dellosantos. There, an indictment charged numerous individuals, including the two appellants, with conspiring to distribute and to possess with intent to distribute cocaine and marijuana. 649 F.3d

at 110-11.  But as we saw it, rather than the single conspiracy charged in the indictment, the evidence demonstrated at least two: one based in Massachusetts to distribute only cocaine (revolving around three individuals, including the appellants), and another based in Maine to distribute both cocaine and marijuana (centered around three different individuals).  Id. at 119.  Both conspiracies sought to sell cocaine that traveled the same supply chain, but we had no trouble distinguishing the two.  Id.  With respect to interdependence, although the evidence showed that the appellants participated in supplying cocaine to the Maine-based conspiracy, we noted that "nothing was presented to the jury to suggest that either of them believed that the success of their cocaine distribution operation likely depended on [the Maine-based conspiracy's] marijuana distribution venture."  Id.

Here, by contrast, there was no second, Maine-based conspiracy distinct from Ortiz-Islas's activity supplying cocaine to LeBlanc in Texas.  It is true that at one time LeBlanc and Rossignol had conspired to sell Canadian marijuana in the United States, but there is no claim that any marijuana conspiracy even endured into the period covered by the Maine-Texas cocaine conspiracy charged here.  Ortiz-Islas simply says that he was indifferent to the success of a LeBlanc-centered conspiracy to distribute cocaine in Maine or elsewhere.  But his actions belie his words.  As noted, for example, the importance of sustaining a

- 10 -

regular course of business was in evidence when Ortiz-Islas showed his willingness to front drugs to LeBlanc on the understanding that LeBlanc would pay in the course of a subsequent transaction. The jury could reasonably have inferred that the continuing vitality of LeBlanc's distribution business was of some importance to Ortiz-Islas. And sufficient evidence supported an inference that Ortiz-Islas knew this distribution business extended to Maine and elsewhere: LeBlanc and Charles both testified that they told Ortiz-Islas that LeBlanc was from Canada, and Ortiz-Islas sought, obtained, and used LeBlanc's phone number, which began with its Maine area code.

In sum, there was no variance. The indictment charged, and the Government proved, a single conspiracy to distribute and to possess with intent to distribute cocaine in Maine and elsewhere.

**B**

The next claim on appeal is that, because the September 2012 sting "transaction" occurred after the indictment issued in August, the district court erroneously admitted evidence of it. Evidentiary rulings are reviewed for abuse of discretion. United States v. Georgiadis, 819 F.3d 4, 14 (1st Cir. 2016).

This point is most easily resolved by recognizing that even if the disputed evidence was not what our case law calls "intrinsic" to the charged conspiracy, it was admissible under

- 11 -

Federal Rule of Evidence 404(b).  See United States v. Mare, 668 F.3d 35, 39 (1st Cir. 2012) (explaining supplementary character of that Rule to the intrinsic-evidence rule; where challenged evidence is intrinsic to crime charged in indictment, Rule 404(b) is "not implicated at all" (internal quotation marks omitted) (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 11 (1st Cir. 2003))).  Rule 404(b) distinguishes admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," which it prohibits, from admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," which it permits.  Fed. R. Evid. 404(b).

In this case, as in others like it, "[t]he evidence in question 'was not just [about] some random drug crime by the defendant from which could be inferred a propensity on his part to commit drug crimes.'  It was closely linked in time to the alleged conspiracy and proved the identities and relationships of the conspirators."  Niemi, 579 F.3d at 128 (citation and alterations omitted) (quoting United States v. Fanfan, 468 F.3d 7, 12 (1st Cir. 2006)).  Here, evidence of the final, faux deal merely illuminated what had been going on among the relevant parties for over a year, a course of conduct that was firmly shown through

overwhelming evidence including co-conspirators' testimony.  The district court accordingly acted within its discretion in admitting the contested evidence.

**C**

Ortiz-Islas's final two claims of error relate to his sentence.  In assessing sentencing decisions, we review matters of law de novo, findings of fact for clear error, and the reasonableness of the sentence for abuse of discretion.  United States v. Guzman-Montanez, 808 F.3d 552, 554-55 (1st Cir. 2015).

**1**

The first of these objections goes to the district court's application of the relevant sentencing statute: 21 U.S.C. § 841(b)(1).  Subparagraph (C) establishes a default range of imprisonment for the criminal objects of the conspiracy charged in this case (irrespective of drug quantity), with a maximum of twenty years and, through silence, a minimum of zero.  As relevant here, subparagraph (A) sets a higher range, a minimum of ten years and a maximum of life, if the offense involved at least five kilograms of cocaine.

The statutory maximum may be based on the quantity of drugs attributable to the conspiracy as a whole, as found by the jury.  See United States v. Razo, 782 F.3d 31, 39 (1st Cir. 2015).  And because this jury found that the conspiracy involved at least

5 kilograms of cocaine, the district court declared that subparagraph (A)'s maximum of life was applicable.

A statutory minimum must rest on a jury finding as well, see id. at 40, and we have previously held that it must be based on the drug quantity attributable to the defendant individually, rather than to the conspiracy collectively, see id. at 39. Here, the jury made no finding on the amount of cocaine for which Ortiz-Islas was personally responsible, and thus the Government did not seek, and the district court did not apply, a statutory minimum. Declining to apply a statutory minimum was functionally equivalent to applying the implicit zero-year minimum under subparagraph (C).

Ortiz-Islas takes these circumstances as an opportunity to contend that the district court used the maximum from subparagraph (A) and the minimum from subparagraph (C). We have to say that we find the claim improbable, given the 170-month sentence actually imposed, which is far from life imprisonment; the court's reference to the life maximum strikes us as more like a stray remark than a ruling that it would apply subparagraph (A). But even assuming both that Ortiz-Islas's characterization of the district court's actions is accurate and that such "mixing and matching" is impermissible, Ortiz-Islas obviously suffered no harm. See id. at 40-41 (noting that we have previously reserved judgment on this question and reviewed for harmlessness beyond a reasonable doubt). Application of subparagraph (A)'s lifetime

maximum did no harm because the district court did not apply the cognate statutory minimum, and the sentence it did impose was well below even the twenty-year maximum prescribed by subparagraph (C). "[N]othing," moreover, "indicates that the 'theoretical' maximum informed the sentencing determination." Id. at 40. Rather, the district court's sentence appears to have been driven "purely [by] [G]uidelines considerations" and "the factors referenced in 18 U.S.C. § 3553(a)." United States v. Rose, 802 F.3d 114, 127 (1st Cir. 2015).[1] The district court's application of the sentencing statute does not require reversal.

**2**

Finally, Ortiz-Islas alleges an unreasonable disparity between his sentence and that of each of his co-conspirators. As against his within-Guidelines sentence of 170 months, Hallett, LeBlanc, Charles, and Rossignol received below-Guidelines sentences of 48, 104, 120, and 120 months, respectively.[2]

---

[1] For what it may be worth, there was overwhelming uncontradicted evidence that Ortiz-Islas was individually responsible for at least five kilograms of cocaine, the finding, if made by the jury, that would have sufficed to trigger the ten-year minimum under subparagraph (A). Charles testified that he transported cocaine purchased from Ortiz-Islas six times and that the first trip involved three kilograms while each of the subsequent trips involved no less than five.

[2] Some of these sentences were subsequently reduced, but not until after Ortiz-Islas was sentenced, so, in analyzing disparity, the district court considered the sentences as set out above.

- 15 -

Title 18 U.S.C. § 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "This provision is aimed, generally, at the minimization of sentencing disparities among defendants nationwide." United States v. Perez, 819 F.3d 541, 547 (1st Cir. 2016). "Unless two identically situated defendants receive different sentences from the same judge, which may be a reason for concern, our general rule of thumb is that a defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." United States v. Reyes-Rivera, 812 F.3d 79, 90 (1st Cir. 2016) (internal quotation marks omitted) (quoting United States v. Rivera-Gonzalez, 626 F.3d 639, 648 (1st Cir. 2010)). "We have noted . . . the permissible distinction between co-defendants who go to trial and those who plead guilty, between those who cooperate and those who do not, and between those whose cooperation is 'prompt and full' and those whose cooperation is 'belated and grudging.'" United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015) (citations omitted) (quoting United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005)). Varying criminal histories, roles in the crime, and offense conduct also can undermine a claim of unjustified disparity between co-defendants' sentences. Id.

Ortiz-Islas says that his sentence is unreasonable, both procedurally because of the district court's failure to explain the disparities adequately, and substantively because of the disparities themselves.  As for procedure, the district court supplied sufficient reasons.  In sentencing each conspirator, including Ortiz-Islas, the court expressly considered the need to avoid unwarranted disparity and discussed the conspirators' differing roles, actions, and histories, as well as the facts that some of them pleaded, cooperated, and testified.  With respect to roles in the conspiracy, for example, the court explained that Ortiz-Islas was perhaps most similarly situated to LeBlanc.  The court accordingly thought it "a little harsh" when the Government sought a sentence for Ortiz-Islas that was over six years longer than the one received by LeBlanc, and the judge accordingly imposed a shorter one.

Nor has Ortiz-Islas carried his "heavy burden" to show that his within-range sentence was substantively unreasonable. See United States v. Carpenter, 781 F.3d 599, 622 (1st Cir. 2015) (internal quotation marks omitted) (quoting United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011)).  The most obvious explanation for the fact that Ortiz-Islas was sentenced within the Guidelines range while Hallett, LeBlanc, Charles, and Rossignol were sentenced below is that the latter individuals all pleaded guilty and three of them testified against Ortiz-Islas.  Ortiz-

- 17 -

Islas, a principal cocaine supplier for the conspiracy, by contrast, neither pleaded, cooperated, nor admitted responsibility.  It was no abuse of discretion to reject his sentencing-disparity claim.

### III

We have considered Ortiz-Islas's remaining subsidiary arguments and find no merit in them.  The district court's judgment is AFFIRMED.