# United States Court of Appeals
## For the First Circuit

No. 15-2406

UNITED STATES OF AMERICA,

Appellee,

v.

TONY BEDINI,

Defendant, Appellant.

No. 15-2426

UNITED STATES OF AMERICA,

Appellee,

v.

ISKENDER KAPLLANI,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Jonathan A. Cox, with whom Felicia H. Ellsworth and Wilmer, Cutler, Pickering, Hale, and Dorr LLP were on brief, for appellant Bedini.

Daniel J. Cloherty, with whom Collora LLP was on brief, for appellant Kapllani.

William A. Glaser, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, and Christopher J. Pohl, Assistant United States Attorney, were on brief, for appellee.

<hr />

June 26, 2017

<hr />

**BARRON, Circuit Judge.** These consolidated appeals involve a number of challenges that Tony Bedini and Iskender Kapllani bring to their convictions and sentences for conspiracy to distribute cocaine under 21 U.S.C. § 846. Together, Bedini and Kapllani contend, among other things, that their convictions cannot stand due to the unfair prejudice that they suffered from being charged with participating in a single drug conspiracy but then jointly tried based on evidence that at most sufficed to show their participation in what were actually two separate drug conspiracies. Because we reject this challenge to their convictions, along with the other challenges that Bedini and Kapllani each bring to both their convictions and their sentences, we affirm the judgments below.

## I.

In 2012, Bedini and Kapllani were charged in the United States District Court for the District of Massachusetts with conspiracy to distribute and to possess with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846. Six other codefendants were also charged in that indictment for the same crime, in consequence of their alleged participation in the same conspiracy. The six other codefendants -- Elton Ceku, Igli Leka, Armand Mara, Bryant Mendoza, Carlos Manuel Tejeda, and Arben Teta -- all pleaded guilty. Bedini and Kapllani did not.

And, following an eight-day, joint jury trial in the District of Massachusetts, they were both convicted under § 846.

Bedini was sentenced to a term of imprisonment of 135 months, to be followed by a three-year term of supervised release. Kapllani was sentenced to a term of imprisonment of 188 months, to be followed by a five-year term of supervised release. Bedini and Kapllani each then appealed their conviction and sentence, and we consolidated their cases on appeal.

**II.**

Bedini and Kapllani each make the same primary challenge to their convictions, and it concerns the sufficiency of the evidence. Bedini and Kapllani contend that, notwithstanding the characterization of the drug conspiracy charged in the indictment as a single one that stretched from Boston to the West Coast, the evidence at trial sufficed to support, at most, a finding of two distinct drug conspiracies, with Bedini a participant in one, Kapllani a participant in the other, and neither a participant in both.

The first of the supposedly distinct drug conspiracies, which we will call the Boston-based one, "involv[ed] the various individuals who were affiliated with the Arbri Café in Roslindale," a Boston neighborhood. This group included Kapllani as well as the following of his co-defendants: Ceku, Leka, Mendoza, and Tejeda. The second of the supposedly distinct drug conspiracies,

-4-

which we will call the West Coast-based one, operated out of California and Las Vegas and involved Bedini and the remaining two co-defendants, Mara and Teta.

Bedini and Kapllani further contend that they were unfairly prejudiced by the claimed variance from the indictment's charging of a single conspiracy to what turned out to be the proof at trial of, at most, the two separate, and geographically disparate, drug conspiracies just described. The claimed prejudice rests on a theory of evidentiary spillover, which gives rise to the concern about "the transference of guilt to an individual defendant involved in one conspiracy from evidence incriminating defendants in a conspiracy in which the particular defendant was not involved." United States v. Sutherland, 929 F.2d 765, 773 (1st Cir. 1991) (citation omitted).

This evidentiary-spillover-based challenge cannot succeed, however, if its premise is mistaken. And so we start -- and, as it turns out, end -- by addressing the threshold issue of whether the evidence at trial sufficed to support a finding of the single conspiracy charged in the indictment.

"The question whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency." United States v. Wihbey, 75 F.3d 761,

774 (1st Cir. 1996) (citing United States v. David, 940 F.2d 722, 732 (1st Cir. 1991)).  "Although conflicting inferences may arise, so long as the evidence is adequate to permit a reasonable trier of fact to have found a single conspiracy beyond a reasonable doubt, the jury's finding will not be disturbed on appeal."  United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009).

"Because each Defendant moved for a judgment of acquittal at the close of evidence, we review their sufficiency claims de novo."  United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011).  In evaluating the evidence to determine whether the evidence suffices to show a single conspiracy, we look to the totality of the evidence.  Id. at 117.  We have found three factors to be helpful in guiding this inquiry: "(1) the existence of a common goal [among the participants], (2) interdependence among participants, and (3) overlap among the participants."  Id. (citation omitted).  We consider what the record shows regarding each of these factors in turn, mindful that "none of [the three factors], standing alone, i[s] necessarily determinative."  See United States v. Sanchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008).

**A.**

We have repeatedly held that "selling cocaine for profit" or "furthering the distribution of cocaine" may constitute a common goal among individuals who have been charged with participating in a single drug conspiracy.  Mangual-Santiago, 562

-6-

F.3d at 421 (citation omitted). Moreover, there was evidence in the record here to support a finding that, in 2010 and 2011, the West Coast-based operation repeatedly sold wholesale quantities of cocaine to participants in the Boston-based operation with the understanding that the cocaine would then be re-sold. And we have held that an inference of a common goal to profit from drug sales is supportable where, as here, the drugs are repeatedly bought by one party from another in "wholesale quantities obviously purchased for further sale." United States v. Ortiz-Islas, 829 F.3d 19, 25 (1st Cir. 2016).

Bedini and Kapllani nevertheless contend that the evidence supports at most the conclusion that the relationship between the Boston- and West Coast-based operations was -- though longstanding and repetitive -- merely an arm's-length buyer-seller relationship, albeit one between a wholesaler and a retailer. And Bedini and Kapllani further contend that, in consequence, the two operations cannot be said to have shared a common goal, even if each operation independently did seek to profit from the sale of cocaine. See United States v. Brown, 726 F.3d 993, 1001 (7th Cir. 2013) (explaining that "buyer-seller relationships . . . do not qualify as conspiracies," because "[p]eople in a buyer-seller relationship have not agreed to advance further distribution of drugs," whereas "people in conspiracies have" (emphasis omitted)).

But, we have recently found that "more than a mere buyer-seller relationship" existed when a party sold wholesale quantities of cocaine and "was even willing to front cocaine," on "the understanding that [the buyer] would pay in the course of a subsequent transaction." Ortiz-Islas, 829 F.3d at 25-26. Fronting wholesale quantities of cocaine in this manner was, we explained, "an act of trust that assumed an ongoing enterprise with a standing objective." Id. at 25.

Here, the record supportably shows that fronting occurred, albeit infrequently. Specifically, there is evidence in the record that on at least two occasions the West Coast-based operation sold substantial quantities of cocaine to the Boston-based operation on credit, rather than for payment at the time of sale. In one such instance, Bedini and Mara, operating out of the West Coast, accepted a small payment from Kapllani, operating out of Boston, in exchange for Kapllani receiving one kilogram of cocaine. Kapllani promised to pay the balance of the cost for the kilogram of cocaine one week later. In another instance, Bedini gave Kapllani one kilogram of cocaine in return for Kapllani's promise to make the payment an hour later. And, in addition, the evidence supportably shows that Kapllani trusted the West Coast-based operation enough to, on one occasion, prepay for cocaine, with a $50,000 prepayment given to Teta (who transported cocaine for Bedini and Mara).

-8-

Bedini contends that our analysis in Ortiz-Islas "depended not only on the defendant's fronting of large quantities of cocaine to a buyer, but also on the conspirators' extensive mutual reliance on another party to facilitate transactions and provide protection." And Kapllani argues that the "few instances where some level of credit may have been provided are insufficient to establish a single conspiracy." In further support of this contention, Bedini and Kapllani emphasize aspects of the record that they contend support the conclusion that "the California defendants were indifferent to the profitability of the operation in the Arbri Café," "had little interest in what the Massachusetts defendants intended to do with the cocaine," and "had little concern about redirecting the cocaine supply away from Massachusetts to other buyers."

Bedini also emphasizes the distinction between sales on credit, which the record supportably shows took place here, and sales on consignment, in which the wholesale supplier has a direct stake in the profits to be reaped by the retail seller, for which there is no record evidence. Consignment sales, he contends, give rise to a significantly stronger inference of interdependence than do sales on credit. See Brown, 726 F.3d at 999-1000.

But, our review is only for sufficiency, and here the evidence supports a finding that the amount of credit extended -- in dollar terms -- was quite high, even though the record does not

-9-

show such extensions to have been routine. And, we must evaluate the significance of this evidence of fronting in combination with the other evidence from trial, rather than in isolation. That other evidence shows frequent sales of large wholesale quantities of cocaine by the West Coast-based operation to the Boston-based operation over a long period of time and on the understanding that the cocaine would then be re-sold. And the evidence also shows a willingness by one of the participants in the Boston-based operation to put a large sum of money up front on the understanding that cocaine for resale would be supplied later by the West Coast-based operation. We thus conclude that, notwithstanding Bedini's and Kapllani's arguments to the contrary, the record supports a jury finding that the parties engaged in "act[s] of trust that assumed an ongoing enterprise with a standing objective" to profit from the sale of cocaine, Ortiz-Islas, 829 F.3d at 25, rather than merely an arm's-length relationship between an indifferent wholesaler and an indifferent retailer.

## B.

We turn then to the next factor, which concerns whether there was "interdependence," id. at 26, between the wholesaler -- Kapllani's West Coast-based operation -- and the retailer -- Bedini's Boston-based operation. We have explained that there is interdependence when "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of

-10-

the scheme." Id. (quoting United States v. Negrón-Sostre, 790 F.3d 295, 309 (1st Cir. 2015)) (emphasis added). And, we have also explained that the fronting of drugs between the supplier of drugs and the one who purchases for resale permits a jury reasonably to infer "that the continuing vitality of" one aspect of the scheme "was of some importance to" the other, notwithstanding a defendant's claim that the two aspects of the scheme were indifferent to one another's success. Id. Accordingly, in light of the evidence described above, this factor, too, points towards the reasonableness of a jury finding a single conspiracy rather than two separate ones.

## c.

The final factor concerns what the evidence shows regarding the "overlap" between the two operations. Bedini and Kapllani contend that there was no "hub" character in the conspiracy or other similar signs of overlap. They thus contend that this factor points against the reasonableness of finding a single conspiracy.

But, as the government points out, there is evidence of extensive ties between the defendants. Six of the defendants -- Bedini, Mara, and Teta from the West Coast; and Kapllani, Leka, and Ceku from Boston -- engaged in drug transactions with each other. In particular, there is much evidence to show that the defendants communicated with one another with regularity over a

-11-

long period of time in the service of the shared activity of coordinating -- sometimes through the fronting of cocaine and at least once by prepayment -- the repeated sale of wholesale quantities of cocaine by the West Coast-based operation to the Boston-based operation. Moreover, there is evidence that, when Kapllani traveled to Las Vegas for several days, he stayed with one of the West Coast-based participants, Teta. Thus, especially given the evidence of fronting already discussed, nothing in the record concerning the overlap between the Boston- and West Coast-based operations precludes a reasonable jury from finding them to be separate aspects of an "ongoing enterprise with a standing objective," id. at 25, namely, a single conspiracy to sell cocaine for profit.

## D.

Because a reasonable jury could find from a consideration of the totality of the circumstances that the evidence suffices to show the single conspiracy charged in the indictment, there was no variance. Thus, Bedini's and Kapllani's sufficiency challenge to their convictions fails.

## III.

Bedini and Kapllani next contend that the District Court erred in rejecting the jury instruction that they had requested regarding whether the jury had to find a single conspiracy. Their requested instruction reads as follows:

-12-

> If you find that the conspiracy charged in the indictment did not exist, you cannot find the defendant guilty of that conspiracy. This is so even if you find that some conspiracy other than the one charged in the indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership. If you find that there was not one overall conspiracy as alleged by the government but instead there were actually several separate and independent conspiracies, then you must find the defendant not guilty of the conspiracy charged in the indictment. Similarly, if you find that the defendant was a member of another conspiracy, and not the one charged in the indictment, then you must find the defendant not guilty of the conspiracy charged in the indictment.

The District Court instead instructed the jury as follows:

> [T]he government must prove two essential elements beyond a reasonable doubt.
>
> First: That the conspiracy specified in the indictment, and not some other agreement or agreements, existed at or about the time or times specified in the indictment. It is not enough that the government simply prove that some type of conspiracy existed, even one involving some of the same alleged conspirators. The proof, rather, must persuade you that the conspiracy proved is in fact the one alleged in the indictment.
>
> Second: The government must prove beyond a reasonable doubt that Mr. Kapllani and Mr. Bedini knowingly and intentionally became a member of the alleged conspiracy with the purpose of seeing the conspiracy succeed in accomplishing its unlawful goals.

Bedini and Kapllani objected at trial to the District Court's failure to give the requested instruction. And, on

-13-

appeal, Bedini and Kapllani contend that the District Court's failure to instruct the jury as they requested prejudiced them by impairing their defense strategy. In particular, Bedini and Kapllani argue that, without the proposed instruction, the jury would not have known that it had an obligation to acquit if it found that there were two separate conspiracies.

We "reverse a district court's decision to deny [an] instruction only if the [proposed] instruction was (1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense." United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013). Our review of "[e]ach step in this three-part test involves a question of law, which we decide de novo." Id.[1]

The District Court's instruction was substantively correct, and Bedini and Kapllani do not argue otherwise. The instruction also made clear that the jury had to find "the" conspiracy charged in the indictment. Thus, contrary to Bedini's and Kapllani's contentions, the instruction substantially covered

_____

[1] We have explained that "[w]e review de novo questions about whether a given instruction is, in substance, legally correct," but "[w]e review for abuse of discretion the particular wording chosen to convey a concept to the jury." Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 47 (1st Cir. 2015).

-14-

the key point that the requested instruction would have made. We thus see no basis for finding that the District Court erred in instructing the jury as it did.

In contending that the District Court erred nonetheless, Bedini and Kapllani point to United States v. Boylan, 898 F.2d 230 (1st Cir. 1990), and United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006). But neither precedent supports their view.

In Boylan, we upheld a decision to reject a requested instruction in favor of an instruction that, if anything, was less clearly encompassing of the substance of the requested instruction than the one at issue here. 898 F.2d at 243-44. And the peculiar circumstances at issue in Pacheco, which concerned the relationship between an instruction and a partial directed verdict that had been previously ordered and withdrawn, bear no resemblance to those at issue in this case. 434 F.3d at 110-11. We thus reject Bedini's and Kapllani's challenge to the denial of the requested instruction.

### IV.

Bedini and Kapllani also challenge their sentences on several grounds, sometimes together, sometimes separately. We consider -- and reject -- each challenge in turn.

### A.

We begin with Bedini. In advance of Bedini's sentencing, a probation officer prepared a presentence

-15-

investigation report (PSR). The PSR attributed 48 kilograms of cocaine individually to Bedini. The United States Sentencing Guidelines set forth base offense levels for defendants based on the crime committed. For several drug crimes, including conspiracy under 21 U.S.C. § 846, the base offense level is set on the basis of the quantity of drugs individually attributable to the defendant. See U.S.S.G. § 2D1.1(c). The guidelines provide a base offense level of 32 for cocaine quantities that are between 15 and 50 kilograms and that are individually attributable to a defendant convicted under 21 U.S.C. § 846. See id. § 2D1.1(c)(4). Thus, the PSR, based on its drug quantity finding of 48 kilograms individually attributable to Bedini, calculated a base offense level of 32 for Bedini.

Because the PSR did not find that any adjustments to Bedini's base offense level were warranted, the PSR calculated Bedini's total offense level to be 32 as well. The PSR also determined that Bedini's criminal history category was III. The PSR thus concluded that the Sentencing Guidelines provided for a sentence for Bedini of 151-188 months' incarceration. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

At sentencing, the District Court, after noting that it had the PSR before it, concluded that it found "the Guidelines are correctly calculated." The District Court did, however, reduce

Bedini's criminal history category from III to II, based on the age of the earliest of Bedini's prior convictions.

While the District Court did not expressly state the implications of this lowered criminal history category, the change shifts the guidelines range downward, to 135-168 months' imprisonment. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table). The government had recommended sentencing Bedini at the low end of the guidelines range of 151-188 months' incarceration prior to the District Court adjusting Bedini's criminal history category downward. The District Court sentenced Bedini to a term of imprisonment of 135 months -- the low end of the revised sentencing range of 135-168 months' imprisonment. In imposing this sentence, the District Court explained that it had "considered the sentencing factors enumerated at 18 U.S.C. § 3553(a)."

Bedini first challenges his sentence on procedural grounds. He contends that the District Court failed to explain why the 135-month sentence was justified under 18 U.S.C. § 3553(a). Because Bedini did not object to this failure of explanation below, our review is for plain error. See United States v. Vargas-García, 794 F.3d 162, 166 (1st Cir. 2015). The District Court stated that Bedini's sentence was justified under the § 3553(a) sentencing factors, and, on review for plain error, we require no more given the nature of the record before us. See United States v. Rivera-Clemente, 813 F.3d 43, 50 (1st Cir. 2016).

-17-

Bedini next contends that the District Court erred procedurally by failing to make individualized findings as to the quantity of cocaine attributable to him. Bedini did not object below, so our review is again for plain error. See Vargas-García, 794 F.3d at 166.

As Bedini acknowledges, the District Court adopted the drug quantity attributable to Bedini set forth in the PSR. A district court "may generally rely on the PSR in making [a drug quantity] determination." United States v. Morales-Madera, 352 F.3d 1, 14 (1st Cir. 2003). The PSR's drug quantity calculation that the District Court relied upon was clearly individualized as to Bedini. In consequence, any challenge to whether the District Court made individualized findings with respect to the drug quantity attributable to Bedini fails.

Bedini also challenges his sentence on substantive grounds. He contends that the District Court erred in attributing 48 kilograms of cocaine to him, given that the jury returned a special verdict form in which the jury found he was not responsible for five or more kilograms of cocaine. This dispute over drug quantity bears on Bedini's sentence because, as we have noted, his base offense level was calculated based on a drug quantity of 15-50 kilograms of cocaine, and he would have received a lower base offense level, and thus a lower guidelines range, had the District

-18-

Court found the lower quantity of cocaine to be attributable to him that the jury found. See U.S.S.G. § 2D1.1(c).

Bedini objected to the drug quantity attribution below, so our review is for clear error. United States v. Bernier, 660 F.3d 543, 545 (1st Cir. 2011). A district court is permitted at sentencing to rely on facts shown only by a preponderance of the evidence, while a jury may convict only if the beyond-a-reasonable-doubt standard is met. See id. at 546. As a result, "[a] jury determination as to the quantity of drugs for which the defendant is responsible does not prevent the district court from finding" -- as it found here -- "a larger amount in the course of determining the guideline sentence." United States v. Picanso, 333 F.3d 21, 25–26 (1st Cir. 2003). Thus, Bedini's sole developed ground for challenging the finding below -- that it conflicts with the jury's lower drug quantity determination -- fails to persuade.

**B.**

We next turn to Kapllani. Kapllani's PSR found that he was individually responsible for 44 kilograms of cocaine. Given the PSR's attribution of between 15 and 50 kilograms of cocaine individually to Kapllani, the PSR assigned him a base offense level of 32 for the offense of drug conspiracy under 21 U.S.C. § 846. See U.S.S.G. § 2D1.1(c)(4). The PSR also applied a four-level enhancement for Kapllani's role as an organizer or leader of the conspiracy, thus bringing his total offense level to 36. See id.

-19-

§ 3B1.1.  The PSR found that Kapllani had a criminal history category of I, which, combined with the total offense level of 36, resulted in a recommend sentencing range of 188-235 months' imprisonment.  See U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

The District Court opened the sentencing hearing by summarizing the PSR's recommendation with respect to Kapllani's total offense level, criminal history category, and guidelines sentencing range of 188-235 months' imprisonment.  The District Court noted that it thought the guidelines calculations in the PSR were "appropriate."  The District Court sentenced Kapllani to the low end of that range, which resulted in a sentence of 188 months' imprisonment.

Kapllani's first challenge to his sentence is a procedural one.  He contends that the District Court failed "to address in any way Mr. Kapllani's objections to the drug quantity calculations in the PSR with any specificity" and failed "to make any finding regarding . . . the quantity of drugs that were attributable to, or reasonably foreseeable by, Mr. Kapllani." (emphasis in original).  Kapllani did not object to this lack of explanation below, so our review is for plain error.  See Vargas-García, 794 F.3d at 166.

The PSR calculated a drug quantity individually attributable to Kapllani based on particular transactions in which he was involved.  In light of these individualized calculations,

-20-

the PSR found 44 kilograms of cocaine attributable to Kapllani. Because the PSR made this individualized drug quantity determination, and because the District Court expressly noted that it found the PSR's guidelines calculations -- which were based on the drug quantity findings -- to be "appropriate," we can infer that the District Court's individualized drug quantity determination was the same as that of the PSR. As a result, this unpreserved procedural challenge fails.[2]

## c.

Kapllani next contends that the District Court erroneously concluded that he was an "organizer" of criminal activity under U.S.S.G. § 3B1.1(a), and thus that the District Court wrongly imposed that sentencing enhancement. Kapllani objected to the application of the enhancement below. We "review a district court's interpretation of the legal meaning and scope of a sentencing guideline de novo," but "factfinding for clear error, giving due deference to the court's application of the

---

[2] Kapllani separately contends that the District Court erred by failing to "reconcile the drug quantity calculations set forth in the PSR with the jury's verdict regarding the drug quantities attributable to Mr. Bedini." But this argument has no merit. Kapllani cites no support for the view that a jury's drug quantity finding with respect to one defendant can call into question the drug quantity attributable to another. Nor does he acknowledge that a district court at sentencing -- unlike a jury at trial -- may rely on facts shown only by a preponderance of the evidence. See Bernier, 660 F.3d at 546.

guidelines to the facts."  United States v. Carrero-Hernández, 643 F.3d 344, 349 (1st Cir. 2011) (citation omitted).

It is clear that there can be "more than one person who qualifies as a leader or organizer."  U.S.S.G. § 3B1.1 cmt. 4. And "[o]ne may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity."  United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995).  More particularly, in determining whether the "organizer" enhancement applies, factors to consider include the following:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. 4.

Kapllani argues that the enhancement is not appropriate here, given his contention that one co-defendant, Leka, "played a far more significant leadership and organizing role" in the Boston-based dealings.  But, as the guideline makes clear, that fact, even if true, would not preclude a finding that Kapllani was a "leader or organizer" of the conspiracy.  The record supportably shows that Kapllani was a key figure in the Boston-based side of the conspiracy, worked frequently to coordinate drug transactions

-22-

with other conspirators, and directed the behavior of at least three individuals involved in cocaine trafficking. We thus find that the District Court did not clearly err in applying the enhancement.

## D.

Finally, both Bedini and Kapllani contend that their sentences were unreasonable in light of the lower sentences given to their co-defendants. Kapllani preserved this challenge, while Bedini did not. Both challenges fail, however, under even the more favorable abuse-of-discretion standard that applies to such a disparity challenge when preserved. United States v. Floyd, 740 F.3d 22, 39 (1st Cir. 2014); see also United States v. Flores-Machicote, 706 F.3d 16, 24 (1st Cir. 2013) (applying plain error review to unpreserved disparity challenge).

Congress has instructed district courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). And we have held that a sentence can be unreasonable "because of [a] disparity with the sentence given to a codefendant." United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015) (citation omitted). But, "[a] well-founded claim of disparity" must compare "apples . . . to apples." United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005). We thus "have routinely rejected disparity claims," as "complaining defendants

-23-

typically fail to acknowledge material differences between their own circumstances and those of their more leniently punished confederates." Reyes-Santiago, 804 F.3d at 467.

So, too, with Bedini and Kapllani. Only Bedini and Kapllani went to trial, while the other defendants they ask us to compare them to all pleaded guilty. Bedini and Kapllani also were more senior members of the conspiracy than many of the other defendants, such as Teta (Bedini's driver) and Mendoza (Kapllani's translator). And every other defendant either testified at trial, was subject to lower applicable Guidelines ranges than Bedini and Kapllani, or both. Thus, Bedini's and Kapllani's disparity claims provide no basis for upsetting the sentences that they received.

## V.

For these reasons, appellants' convictions and sentences are **affirmed**.