# United States Court of Appeals
## For the First Circuit

Nos. 16-2468; 17-1183

UNITED STATES OF AMERICA,

Appellee,

v.

AKEEN OCEAN; JERMAINE MITCHELL,

Defendants, Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Kayatta, Circuit Judge,
and Torresen,* Chief U.S. District Judge.

———————————

Merritt Schnipper, with whom Schnipper Hennessy was on brief, for appellant Ocean.
Seth Kretzer, with whom Law Offices of Seth Kretzer was on brief for appellant Mitchell.
Renee M. Bunker, Assistant United States Attorney, with whom Halsey B. Frank, United States Attorney, was on brief, for appellee.

———————————

September 11, 2018

———————————

* Of the District of Maine, sitting by designation.

**TORRESEN, <u>Chief District Judge</u>.** Following a joint jury trial, Akeen Ocean and Jermaine Mitchell were convicted of a conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The district court sentenced Ocean to 120 months imprisonment with three years of supervised release and Mitchell to 260 months imprisonment with five years of supervised release. On appeal, Ocean claims that: (1) there was insufficient evidence to convict him of the charged conspiracy; (2) the admission of recorded jailhouse conversations he had with a girlfriend who cooperated with the Government violated his Sixth Amendment right to counsel; and (3) the sentencing judge erred in calculating his drug quantity. Mitchell argues that allowing two law enforcement witnesses to testify that a particular substance was crack cocaine was both evidentiary error and a violation of his Sixth Amendment right to confrontation. Finding no merit in any of the appellants' claims of error, we affirm both convictions and Ocean's sentence.

## I.   Akeen Ocean

### A.   Sufficiency of the Evidence

Because Ocean raised his sufficiency objection in a Rule 29 motion, the standard of review is de novo. <u>United States</u> v. <u>Ramírez-Rivera</u>, 800 F.3d 1, 16 (1st Cir. 2015). In considering the totality of the direct and circumstantial evidence, we draw all inferences in favor of the government and consistent with the

verdict, and "we will reverse only if the verdict is irrational." Id. (quoting United States v. Brandao, 539 F.3d 44, 50 (1st Cir. 2008)).  Here, we recount the facts against Ocean on the conspiracy count in the light most favorable to the verdict.  United States v. Rodriguez, 162 F.3d 135, 140 (1st Cir. 1998).  We address the facts pertinent to other claims later in the opinion.

Count One of the Indictment alleged that between January 1, 2010 and August 30, 2013 in the District of Maine, Defendants Mitchell and Ocean, along with Jeffrey Benton, Christian Turner, Willie Garvin, Torrence Benton, Jeremy Ingersoll-Meserve, Jacqueline Madore, David Chaisson, Burke Lamar, and Wendell White, conspired to distribute and possess with the intent to distribute 280 grams or more of cocaine base.

### 1.  Factual Background

The evidence at trial established that Defendant Mitchell oversaw the distribution of crack cocaine that was being transported from New Haven, Connecticut to Bangor, Maine.  Mitchell was assisted in the Bangor area by Christian Turner and a man named Rodrigo.

The distribution of the crack in and around Bangor depended on a network of local addicts, including Defendant Ocean, his girlfriend Christie, and others.  For every four or five grams of crack sold, each addict would earn a gram of crack for personal use.  The going rate to the addicts was about $100 per gram of

crack. By selling the crack to their friends and acquaintances, the addicts provided the customer base for the operation and were able to support their own habits.

Mitchell operated out of Christie's apartment on Court Street in Bangor for two or three months in 2011. Mitchell then installed Rodrigo at the Court Street apartment so that Mitchell could tend to business elsewhere. Rodrigo assumed the role of doling out the crack to the addict-dealers and collecting the money from them. Mitchell came by frequently to collect the proceeds. During this period, Ocean was staying several nights a week at Christie's place.

Ocean was not pleased when Rodrigo moved into Christie's apartment because he thought it would attract the attention of law enforcement. Despite his displeasure with the arrangement, Ocean continued to purchase crack from Rodrigo. Rodrigo testified that Ocean was "high all the time, but he . . . also brought me a lot of . . . clientele. He helped me out a lot." Because Ocean did not like people coming to the residence, he conducted his sales away from the Court Street apartment. By Christie's estimate, during the five or six months that Rodrigo was at her residence, Ocean purchased about 100 grams of crack from him. Three witnesses testified that they purchased crack from Ocean, with one witness estimating that he purchased approximately 40-50 grams of crack from Ocean between 2010 and 2013.

Christie, who was not initially happy about Rodrigo living at her apartment, grew even more tired of him after he began to short her and deal directly to her customers. Rodrigo testified that at some point Christie stopped coming home because she owed him and other distributors money. Eventually, Rodrigo moved out of the apartment and set up shop at the homes of other conspirators. Ocean continued to help Rodrigo after he moved out. Rodrigo testified that Ocean also bought crack directly from Turner from time to time.[1]

The New Haven police conducted a taped interview with Ocean in September of 2014. The recording was played at trial, and it corroborated much of the witnesses' testimony. In that interview, Ocean admitted that he had dealt with Rodrigo and Turner in Bangor for about eighteen months in 2010 and 2011. He told the detectives that his girlfriend introduced him to Rodrigo who was staying with her. He explained that he was a "middleman" "running to support my habit." He stated that the amounts he would buy from Rodrigo would vary anywhere from two to twenty grams in a day. Although he was not as familiar with Turner, Ocean acknowledged that he had met him and that he could call Turner if Rodrigo was out of product. Ocean described a falling-out with Rodrigo after Rodrigo stole

---

[1]    The supply chain was not always static. One witness who regularly purchased crack from Ocean recalled a time when he obtained crack from Mitchell to sell to Ocean.

from him.  He admitted that he knew others who were involved from Bangor, including Madore and a woman named Fern.  He claimed that he was not "in the loop" with Rodrigo and Turner, and he denied ever traveling to Connecticut to reup with them.  He summed up his involvement like this:  "I bought drugs from them and kept it moving."

Finally, in recorded jailhouse conversations also admitted at trial, Ocean, apparently referring to his interview with the New Haven detectives, told Christie:

> I said if that's what you call it, yeah I was a middleman. . . .  I say yeah, I might have got some money out, I might have got a couple of dollars out of it, I might have got some crack, that's where I fucked up.

### 2.  Analysis

In framing his sufficiency challenge, Ocean concedes that the evidence established a conspiracy to distribute cocaine base from New Haven to Bangor and that he participated in a branch of this venture.  He claims that the government alleged a hub and spoke conspiracy around Mitchell and Benton and argues that because he had little interaction with either of them, there was insufficient evidence to support his conspiracy conviction.  He argues that the evidence was insufficient to show that he joined the conspiracy or shared the conspirators' goals because he sold drugs only to feed his addiction, did not provide the type of support services that other coconspirators did, and was indifferent to the goals of the conspiracy and hostile to Rodrigo.

Although he never uses the term "variance," Ocean's opening brief reads like a variance argument, i.e., that Ocean's activities were not part of the broader charged conspiracy but some other conspiracy. Ocean follows the typical analysis for a variance claim, addressing the factors of commonality, overlap, and interdependence. See United States v. Ortiz-Islas, 829 F.3d 19, 24 (1st Cir. 2016) (in determining whether evidence is sufficient to show a single conspiracy, rather than several, courts look to "(1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants" (quoting United States v. Paz-Alvarez, 799 F.3d 12, 30 (1st Cir. 2015))).

Not surprisingly, the Government responds by arguing that there was no variance between the crime charged and the one proved at trial. The Government points out that the Indictment did not charge a broader "New Haven-to-Bangor" conspiracy but merely charged a conspiracy to distribute cocaine base in the District of Maine. Further, the Government counters, there was no allegation that this was a hub conspiracy centered on Mitchell and Benton, and in fact the charged conspiracy was either a hub with Rodrigo at its center or a chain conspiracy. Either way, the Government claims, it introduced sufficient evidence to convict Ocean of the charged conspiracy.

In his reply brief, Ocean clarifies something that he had hinted at in his opening brief. His claim is not just that the evidence was insufficient to establish that he participated in the broader conspiracy involving Mitchell and sources in Connecticut. His claim is that because he did not share the goals of any of the conspirators, he therefore could not have been convicted of either the broader "New Haven-to-Bangor" conspiracy or the narrower conspiracy in Bangor.

We agree with the Government that it was not required to prove that Ocean was a participant in a broader conspiracy to distribute drugs from Connecticut. That is not what the Indictment charged. Moreover, viewing the record in the light most favorable to the verdict, we find ample evidence that Ocean did participate in the charged conspiracy.

> To prove a conspiracy, the evidence must show:

> (1) the existence of a conspiracy, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy. "Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy."

United States v. Paz-Alvarez, 799 F.3d 12, 21 (1st Cir. 2015) (quoting United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011) (internal citation omitted)). It is not necessary to "prove that each defendant knew all of the details and members, or participated in all of the objectives, of the conspiracy as long

as [the government] can show knowledge of the basic agreement." United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994).

Defendant Ocean concedes that a conspiracy existed and that he knew of it. He contends, however, that the Government fell short on the third element. We address Ocean's contentions that he did not participate in the conspiracy because he sold crack only to feed his addiction, his role was limited to reselling crack, and he was indifferent to the goals of the conspiracy and hostile to Rodrigo and others.

The fact that Ocean sold largely to feed his addiction rather than to line his pocket does not mean that Ocean did not intend to distribute drugs to others. The fact that a conspirator prefers his spoils in product rather than cash provides no defense to a charge of a drug distribution conspiracy. The question is whether there was evidence that Ocean intended to distribute the drugs in Maine. This conspiracy depended on addict-dealers who agreed to sell four or five grams in order to obtain one gram for their personal use. The structure incentivized the addicts to sell as much as possible to increase the amount available for their own consumption. The evidence at trial showed that Ocean was more than a mere end-user. Ocean purchased and distributed drugs for a period of about a year and a half, and he purchased as much as 20 grams in a day. Although Ocean was on the lower rungs of the organization and he happened to be a user, the evidence established

that Ocean willingly helped out-of-state distributors move their product in the Bangor area.  It has long been established in this circuit that individuals who seek to "further[] the distribution of cocaine" share a "common goal."  United States v. Bedini, 861 F.3d 10, 14-15 (1st Cir. 2017); Ortiz-Islas, 829 F.3d at 25 ("existence of a common goal[] is broadly drawn and . . . satisfied by evidence of a shared interest in furthering the distribution of drugs" (internal quotation marks omitted)).

Ocean also claims that his limited role in the conspiracy and the fact that he did not engage in transporting or housing other conspirators shows that he was not a part of the conspiracy.  Ocean concedes that he purchased crack from Rodrigo and Turner and sold it to his own customers.  That conduct was his involvement, and through it he knowingly facilitated the conspiracy to distribute crack in Bangor.  It is not "necessary that each coconspirator participate in every aspect of the conspiracy."  United States v. Mangual-Santiago, 562 F.3d 411, 422 (1st Cir. 2009).

Ocean argues that he could not have shared the goals of Mitchell and Rodrigo because he was hostile to their tactics. Ocean highlights evidence of his displeasure with Rodrigo moving into Christie's apartment and poaching her clients.  He notes that three individuals initially purchased cocaine base from him and then started buying directly from Rodrigo, suggesting that Rodrigo stole his clients too.  But there was evidence that Ocean continued

to do business with Rodrigo even after Rodrigo moved out of Christie's apartment. Despite his misgivings about some of the tactics used by Rodrigo, Ocean was willing to stay connected to him. "It is not far-fetched to assume that shifting alliances and spouts of deception among members of [a drug trafficking conspiracy] would be par for the course and, importantly, would not necessarily undermine the overarching goals of the conspiracy." United States v. Belanger, 890 F.3d 13, 31 (1st Cir. 2018); see also United States v. Negrón-Sostre, 790 F.3d 295, 309-10 (1st Cir. 2015) (that individuals resolved their conflict in favor of continued drug distribution indicated interdependence).

Ocean admitted he purchased drugs from Rodrigo and Turner and described himself as a "middleman" who "bought drugs" and "kept it moving." Ocean's own words are likely the best evidence that he intended to join the conspiracy and shared its goals, but the testimony of his coconspirators corroborated his account. Christie estimated that in the course of about five to six months, Ocean purchased about 100 grams of crack from Rodrigo and that he sold the drugs to his own customers. Rodrigo testified that Ocean brought him a lot of clientele. At least three witnesses testified that they had purchased crack from Ocean, with one estimating that over the course of the conspiracy he purchased 40-50 grams of crack from Ocean.

The record contains sufficient evidence for a jury to conclude that Ocean intended to join the conspiracy and intended to effectuate its goals. Because the verdict is amply supported, the sufficiency challenge fails.

**B.    Massiah Claim**

Ocean's second challenge to his conviction involves the admission of his recorded jailhouse conversations with Christie. On June 14, 2016, after jury selection but before the start of the trial, the prosecution learned that Christie had been meeting with Ocean at the Somerset County Jail. On June 17, 2016, the Government filed a supplemental trial brief stating it would introduce five of the intercepted conversations between Christie and Ocean at trial.

Ocean objected to the admission of this evidence on the grounds that it violated his Sixth Amendment rights under Massiah v. United States, 377 U.S. 201, 206 (1964). The trial court allowed the parties to conduct a voir dire of Christie to develop evidence of whether she had been acting at the Government's direction when she met and talked with Ocean in the months before the trial.

During voir dire, Christie testified that she participated in a proffer with a prosecutor at the United States Attorney's Office in Bangor on August 11, 2014. Based on her proffer, the Government extended use immunity to Christie on September 17, 2014, and she

testified before the grand jury that day.  In June of 2016, the Government served Christie with a trial subpoena, and she met with federal prosecutors on June 15, 2016, shortly before the trial began.  Between September 17, 2014 and June 15, 2016, Christie had no contact with any representative of the United States Attorney's Office.  And, other than being served a trial subpoena, she had no contact with anybody from the investigating agency during that period.

At some point in early 2016, Christie was in the Somerset County Jail on a burglary charge and she realized that Ocean was also at the jail.  Christie managed to give Ocean her phone number, and he began to call her after she got out of jail.  Christie reached out to Ocean because he was a friend of hers:  "We have past.  I care about him.  It didn't seem to be a problem to me."  In a recorded call from April 15, 2016, Ocean told Christie to come see him at the jail on Sunday, and she agreed that she would.  Christie stated that she did not go see Ocean because the Government asked her to see him, and she did not tell the Government that she had talked to Ocean.

After the voir dire, the trial judge found that there was no evidence that the Government instructed Christie to contact Ocean and no indication that she was acting on behalf of the Government.  "There's no indication of any conversation with the police from which I could even begin to infer that she was acting as a

government agent."  Based on these findings, the trial judge rejected Ocean's claim of a Massiah violation.  We review the trial judge's findings of fact for clear error, and we find none.  See United States v. Nascimento, 491 F.3d 25, 50 (1st Cir. 2007).  We review de novo his constitutional conclusion based on the facts as the trial judge found them.  Id.

The Sixth Amendment provides, in pertinent part, that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel attaches upon the start of criminal judicial proceedings. Brewer v. Williams, 430 U.S. 387, 398 (1977); Roberts v. Maine, 48 F.3d 1287, 1290 (1st Cir. 1995).  Under the Massiah doctrine, the Sixth Amendment right to counsel is violated when "evidence of [the defendant's] own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel" are admitted during trial.[2] Massiah,

---

[2]    Winston Massiah was indicted on a charge of possessing narcotics and released on bail.  Massiah v. United States, 377 U.S. 201 (1964).  Unbeknownst to Massiah, a co-defendant named Colson, also released on bail, began cooperating with the government.  Law enforcement installed a radio transmitter under the front seat of Colson's car that allowed them to overhear conversations in the car from a distance.  When Massiah had a conversation with Colson in his car, law enforcement overheard Massiah make several incriminating statements.  At Massiah's trial, the law enforcement officer testified to the incriminating statements, and Massiah was convicted. The Supreme Court reversed, finding that the government's use of statements obtained by law enforcement under these circumstances violated the defendant's Sixth Amendment right to counsel.

377 U.S. at 206.  Deliberate elicitation occurs when the government "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel."  United States v. Henry, 447 U.S. 264, 274 (1980).

"[A] successful Massiah objection requires a defendant to show, at a bare minimum, that the person with whom he conversed had previously been enlisted for that purpose by the authorities." United States v. Wallace, 71 F. App'x 868, 870 (1st Cir. 2003). Which party initiated the meeting at which the government obtained the statements is "not decisive or even important" to the Massiah analysis.  Maine v. Moulton, 474 U.S. 159, 174 (1985).  The government has an "affirmative obligation not to act in a manner that circumvents the protections accorded the accused."  Id. at 176.

In Henry, relied on by the appellant, the Supreme Court found that the government can "deliberately elicit" statements by intentionally creating a situation likely to induce a defendant into making incriminating statements.  There, a paid informant named Nichols was staying at the city jail where Henry had been lodged on charges of bank robbery.  447 U.S. at 266.  Nichols told federal agents that he was sharing a cell with Henry, and the agents instructed Nichols to keep his ears open but not to question Henry about the robbery.  Id.  Ultimately, Henry made incriminating statements to Nichols about his involvement in the robbery, and

- 15 -

Nichols was allowed to testify about those statements at Henry's trial.  Id. at 267.  The Supreme Court found three factors important in its analysis of whether Henry's jailhouse statements were deliberately elicited.  Id. at 270.  First, the government had engaged Nichols as a paid informant for over a year and only paid him for useful information; second, Henry was unaware that Nichols was anything more than a fellow inmate; and third, Henry was in custody and under indictment when Nichols engaged him in conversation.  Id.  The Court concluded that the agents "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel," in violation of his Sixth Amendment rights.  Id. at 274.

This case is a far cry from Henry, and it is distinguishable on two of the factors mentioned above.  First, although Ocean contends on appeal that Christie was a government agent, the trial judge found otherwise, and that finding is supported by the record. The Government did not instruct Christie to visit Ocean or to report back what she learned from him.  Christie had no contact with the Government between her testimony at the grand jury in September of 2014 and June of 2016, when she was served with a trial subpoena.  Christie visited Ocean of her own volition because he was a friend. She did not advise the Government that she had visited him.  Although Christie testified under a grant of

immunity,[3] there was no evidence of any agreement by her to elicit information from Ocean or to work as a Government informant. "[T]he Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached."  Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986) (quoting Moulton, 474 U.S. at 176).

Beyond his claim that Christie acted as a government agent, Ocean contends that the Government made him more susceptible to self-incrimination by detaining him pretrial, thus creating this situation and its consequences.  Under this theory, however, any pretrial detainee who has made an incriminating statement that comes to the attention of authorities would be able to establish a Sixth Amendment violation.  Further, it was the court, and not the Government, that made the decision to detain Ocean pending his trial, and the court's decision to detain Ocean had nothing to do with putting him in a position where he was more likely to incriminate himself.

As for the second Henry factor, Ocean knew that Christie had immunity and had been subpoenaed to testify in his trial.  Neither of the defendants in Henry or Massiah knew that he was speaking to

---

[3]    Though Christie had a proffer agreement and testified under a grant of immunity by the Government, she did not enter a cooperation agreement with the Government and was not charged federally in connection with the case.

- 17 -

someone who had cooperated with the Government.  See Henry, 447 U.S. at 272; Massiah, 377 U.S. at 206; see also United States v. Payton, 615 F.2d 922, 924 (1st Cir. 1980) ("unlike the situation in Massiah . . . [the defendant] knew his interrogator was a government agent").  Ironically, although Ocean complains that Christie and the Government set him up, the transcripts reveal that Ocean was attempting to convince Christie not to testify against him.  If anyone had a nefarious motive for the meeting with Christie, it was Ocean, not the Government.

Where, as here, there is no evidence of an effort by the Government to get incriminating statements from Ocean, the Defendant has failed to make out a violation of his Sixth Amendment rights.  See Henry, 447 U.S. at 273 (citing Massiah, 377 U.S. at 206); see also Wallace, 71 F. App'x at 871 (jailhouse informant had no "marching orders," and his testimony was therefore properly admitted); Creel v. Johnson, 162 F.3d 385, 394 (5th Cir. 1998) (informant who told officials the location of victim's body not an "agent of the state" where no evidence existed of benefit to her or of control or direction by government).  Because we find no Sixth Amendment violation, there was no error in admitting these statements.

### C.   Sentencing

Finally, Ocean challenges the district court's drug-quantity calculations at sentencing.  Appellate review of factual findings

- 18 -

at sentencing is for clear error and review of the application of the sentencing guidelines is de novo. United States v. Demers, 842 F.3d 8, 12 (1st Cir. 2016). The government has the burden of proving drug quantity by a preponderance of the evidence, and courts must make a "reasonable approximation" of drug quantity, which "need not be precise to the point of pedantry." Id. (quoting United States v. Platte, 577 F.3d 387, 392 (1st Cir. 2009)); United States v. Doe, 741 F.3d 217, 235 (1st Cir. 2013).

At sentencing, the judge set Ocean's base offense level at 30, accepting the probation office's conclusion that Ocean was responsible for five grams, three days per week, for one year, for a total of 780 grams. The probation office based its estimate on Ocean's statement to the New Haven police that he obtained on average 5-20 grams of crack daily for approximately twelve to eighteen months.

Ocean challenges this calculation for failure to deduct the cocaine base that he personally used from the total drug quantity. The Government claims that because he withdrew this argument from his sentencing memorandum, Ocean has waived it. See United States v. Sánchez-Berríos, 424 F.3d 65, 74 (1st Cir. 2005) ("A party waives a right when he intentionally relinquishes or abandons it."). In his sentencing memorandum, Ocean stated:

> [t]he defendant has been provided with case law including the First Circuit Court of Appeals case of United States v. Innamarati, 996 F.2d. 456 (1993) and others and withdraws his assertion that those drugs

- 19 -

> which would have been for personal use was [sic] not part of the conspiracy. As prior cases tend to show, because cocaine base is a scheduled I drug, excluding personal use portion of the drug quantity for guidelines sentence calculation does not seem to apply.

We agree that this constitutes waiver.

Finally, Ocean challenges the use of his statement to the New Haven police to calculate drug quantity because of the "context in which it was made." He argues that the New Haven officer's admonition not to "minimize" constitutes encouragement to overestimate. In addition, he argues that the broader record contradicts his own estimation, citing to Christie's estimate of the amount he received in a six-month period and his customers' estimates of how much they bought from him. "When faced with conflicting facts relating to drug quantity, a district court is at liberty to make judgments about credibility and reliability." Demers, 842 F.3d at 13. The court was at liberty to rely on Ocean's own estimate as the most accurate assessment of drug quantity. On this basis, we find no error.

## II. Jermaine Mitchell

Ocean's co-Defendant Jermaine Mitchell raises two related arguments in his appeal. First, he contends the trial judge erred by allowing two law enforcement lay witnesses to testify that they believed a substance they seized was crack cocaine. Mitchell says that because the officers mentioned that laboratory reports were created but the reports were not entered into evidence and the

underlying chemists who wrote the report were not called as witnesses, the law enforcement lay witnesses "were bronzed with an impermissible expert-witness gloss." Second, Mitchell argues that this same testimony about the reports came in without an opportunity for him to examine the chemists who prepared the reports and thus amounted to a Sixth Amendment violation of his right to confront the witnesses against him. In order to address these arguments, it is necessary to provide some context.[4]

## A. Background

### 1. Trooper Gacek

At the time of his testimony, Brian Gacek had been a New Hampshire State Police trooper for over ten years. He testified that on December 28, 2011, he stopped a car driven by Adam Brooks for a traffic violation. Mitchell was in the passenger seat and Fern Dowling was in the back seat. Trooper Gacek impounded the vehicle and obtained a search warrant for the car. Anticipating that Trooper Gacek was about to testify that he found crack cocaine in the car, Defendant Mitchell's attorney asked to approach sidebar and said,

> the Government's never given us any sort of lab report
> . . . that did an analysis and found that it was crack
> cocaine.[5]   And I am not sure that this witness is

---

[4]    Mitchell also filed a pro se brief, raising four arguments not presented in his counseled brief. We have considered them, and find each to be without merit.

[5]    Mitchell does not argue on appeal that his non-receipt of the lab reports constitutes a discovery violation.

qualified to testify that the chemical compound is crack cocaine, so I object on that basis.[6]

The prosecutor responded that Trooper Gacek would be testifying based on his experience and training that the substance appeared to be crack cocaine.  The trial judge overruled the objection citing the fact that there was already sufficient evidence that the substance was crack cocaine.[7]  The court indicated that if the prosecutor laid a proper foundation, Trooper Gacek could say what he thought the substance was.  Trooper Gacek, after testifying that he found a bag that contained a yellowish off-white, rock-like substance, said that, based on his training and experience, he believed the substance was crack cocaine.[8] Trooper Gacek also testified that he found a "crack pipe" in the vehicle.

On cross-examination, Ocean's attorney asked the trooper whether he had tested the crack pipe, and the trooper responded that he believed it was sent to the New Hampshire Police Forensic Lab along with the other evidence.  On further questioning by

---

[6]    At this point, Defendant Ocean's attorney also spoke up and argued that a chemist at the Maine HETL lab had told him that "if it is merely a white powder or a crystallized form . . . that under no reasonable scientific level could that ever be determined that it's cocaine versus any other drug."

[7]    Fern Dowling had already testified that they were transporting crack cocaine when they were stopped by the police in New Hampshire.

[8]    When the prosecutor offered a photograph of the bag of the items seized from the car as Government Exhibit 36, both defense counsel again objected citing the "same objection at sidebar as to foundation and scientific."

Ocean's attorney, Trooper Gacek explained that all evidence in drug cases would be sent to the lab. He indicated that he could not recall what the results were, but that he knew that a lab report was generated in this case. Defendant Mitchell's attorney never raised an objection to any of this testimony.

### 2. Detective Quintero

Scott Quintero, a Maine State Police Detective, testified that on August 29, 2013, while on patrol at the Portland bus terminal, he approached and spoke with Mitchell. Mitchell volunteered that he had some marijuana and that he might have some other stuff in his pocket. Detective Quintero gave <u>Miranda</u> warnings and asked Mitchell if he could remove the marijuana from Mitchell's pocket. Mitchell consented. Detective Quintero reached into Mitchell's pocket and removed the marijuana and a small rock wrapped in cellophane. Detective Quintero, who had been with the Maine State Police for seven and a half years at the time of trial, testified that he recognized the rock as crack cocaine based on its unique appearance and how it was packaged.

At this point, at sidebar, Ocean's attorney stated:

> I am not aware of any testing done on this crack cocaine. And I am not aware that the HETL lab has been listed as a witness in this case. And therefore, I am going to object under Rule . . . 701 with regard to whether or not this can be characterized and introduced as crack cocaine.

The prosecutor indicated that, like Trooper Gacek, Detective Quintero was able to recognize the substance based on his training

and years of experience as a drug agent. Ocean's counsel explained that because the substance had not been tested, it was prejudicial to allow the detective to testify as to what he believed it was. Defense counsel for Mitchell offered no objection or comment. The trial judge overruled the objection on the ground that defense counsel was free on cross-examination to inquire into any infirmities in the Detective's knowledge and experience, and he could also inquire as to whether any laboratory testing had been done on the substance.

After questioning resumed, Detective Quintero testified that Mitchell himself admitted that the substance was crack. Detective Quintero then told Mitchell that he was going to arrest him, and Mitchell volunteered that he had additional drugs by his ankle. Detective Quintero retrieved a much larger bag of a substance from the area of Mitchell's ankle. Detective Quintero testified that he recognized the substance in the larger bag as crack cocaine based on his training and experience, and that Mitchell again had confirmed that it was.

On cross-examination, Ocean's counsel asked Detective Quintero whether he sent the substance to a lab for testing. Detective Quintero confirmed that he did send the substance for testing, and he believed that results were received. Mitchell's counsel offered no objection. When Ocean's counsel began to ask

about a particular chemist at the state lab, the prosecutor objected on relevance grounds.

At sidebar, the prosecutor pointed out that Mitchell had already pleaded guilty to possessing this crack cocaine in state court. The trial judge then expressed concern about wasting the jury's time if in fact Mitchell had not only admitted that the substance was crack cocaine but had pleaded guilty to its possession. Mitchell's counsel commented that people plead guilty without necessarily having the scientific analysis of a substance. Ocean's counsel reiterated his position that without scientific testing it is impossible to tell whether a substance is crack cocaine. The prosecutor indicated that he did not plan to bring in the chemist who had conducted the test and pointed out that the Government did not have to prove that the substance was in fact crack cocaine because the defendants were charged with conspiracy rather than the substantive count of possession with the intent to distribute. The trial judge directed defense counsel to move along.

## B. Evidentiary Objection

Mitchell contends that Trooper Gacek and Detective Quintero's opinions that the substance they each seized was crack cocaine were inadmissible because the officers referred to laboratory reports, but no corresponding reports were submitted into evidence and no expert chemist was called as a witness to verify the

reports' contents.  While he does not cite the rule, this argument seems to be piggy-backing off the argument made at trial by Ocean's counsel that the testimony violated Rule 701.  Rule 701 addresses opinion testimony by lay witnesses and requires that an opinion by a lay witness be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [the rule on testimony by expert witnesses]."  Fed. R. Evid. 701.

Except for an initial objection that Trooper Gacek lacked the qualifications to testify that the compound seized was crack cocaine with no follow-up objection after the prosecutor laid a foundation, Mitchell's counsel raised no objections either to the law enforcement officers' identification of the substance as crack cocaine or to Ocean's counsel's questions about the existence of lab reports.  Belanger, 890 F.3d at 27 (individual defendants are required to raise their own objections).  And Mitchell's counsel never raised at trial the argument that the report bolstered the officers' testimony that he now presents on appeal.  United States v. Mercado, 412 F.3d 243, 247 (1st Cir. 2005) (objection on one ground does not preserve appellate review of a different ground).  Accordingly, review is for plain error.  Plain error exists where "(1) an error occurred (2) which was clear or obvious and which not only (3) affected [the defendant's] substantial rights, but

also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Mangual-Santiago, 562 F.3d at 427 (alternation in original). Plain error "is a difficult hurdle to vault," and Mitchell has not cleared it here. See United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016).

Mitchell argues that because the officers testified that they had seen lab reports, the implication was that the lab reports confirmed the presence of cocaine base. This inference "bronzed" the testimony of the lay law enforcement witnesses with an impermissible expert-witness gloss, according to Mitchell.

There are two problems with this argument. First, as the Government points out, it was Ocean's counsel, not the Government, who brought up the lab reports. The lack of an objection by Mitchell's counsel may well have been because he did not believe that questions about missing lab reports were prejudicial to his client. The prosecution's decision not to enter the reports and the officers' inability to remember the results provided fertile ground for closing arguments. Defense counsel were free to claim that the Government would have introduced the lab reports if the labs had confirmed that the substances were cocaine base. To allow a defendant to raise a point on appeal that he may have strategically decided not to raise at trial would invite sandbagging by the defense. United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995)(the raise-or-waive rule "precludes a party

from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error (or, even worse, planting an error and nurturing the seed as insurance against an infelicitous result)").

Second, as Mitchell concedes, the identification of a substance as a drug may be based upon the opinion of a knowledgeable lay person. United States v. Walters, 904 F.2d 765, 770 (1st Cir. 1990)("Proof based on scientific analysis or expert testimony is not required to prove the illicit nature of a substance, and identification of a substance as a drug may be based on the opinion of a knowledgeable lay person."); United States v. Paiva, 892 F.2d 148, 155-57 (1st Cir. 1989)(finding a drug user competent to give a lay witness opinion that a particular substance perceived by her was a particular drug, based on her own experience or knowledge). Mitchell is not contending on appeal that allowing the officers to testify based on their experience and training that they believed the substance was crack cocaine was error, but rather that the references to lab reports -- invited, we note, by the defense -- inappropriately bolstered the testimony. There was ample evidence that the substance seized by each law enforcement witness was crack cocaine. A witness testified that they were carrying crack cocaine when they were stopped by Trooper Gacek in New Hampshire. And Detective Quintero testified that Mitchell himself admitted that the substance seized from him was crack

cocaine. In light of the significant evidence already in the record, the incremental effect of the references to laboratory reports (without even stating the results contained in the reports) did not affect Mitchell's substantial rights or seriously impair the fairness of the proceeding. Mitchell fails to demonstrate error, let alone plain error.

## C. Confrontation Clause

In addition to his evidentiary objection, Defendant Mitchell makes a one-paragraph argument that Mitchell's rights under the Confrontation Clause of the Sixth Amendment were violated when Trooper Gacek and Detective Quintero testified that they had seen lab reports.

It is now well established that the government cannot introduce a report created to serve as evidence for a criminal proceeding without making the author of the report available for cross examination. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310, 329 (2009) (finding a forensic lab report testimonial and so requiring testimony from a witness competent to testify to the truth of the report's statement to admit the report); see also Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011) (under the Confrontation Clause, a lab report stating defendant's blood alcohol concentration could be admitted only with testimony from analyst who performed, observed, or certified report, unless that

person was unavailable and the defendant had the opportunity to cross-examine her before the trial).

But here the Government did nothing of the sort. The Government relied on the lay testimony of the officers, knowledgeable drug users, and an admission of the Defendant to identify the substance at issue. The Government never sought to admit the lab reports and never sought to question the witnesses about the existence of any such reports. Only Ocean's counsel questioned the officers about lab reports, and Mitchell's counsel offered no objection to this line of questioning. As above, review of objections not raised by the appellant at trial is for plain error.[9] Here we find none.

## III.

For the above stated reasons, we <u>affirm</u> Ocean's conviction and sentence and <u>affirm</u> Mitchell's conviction.

---

[9] Mitchell argues that although the Sixth Amendment was not mentioned at trial, a Confrontation Clause objection was embedded in a comment made by Ocean's counsel that the lab was not listed as a witness in the case. Even assuming this comment can be interpreted as an objection under the Sixth Amendment, no objection was made by Mitchell's counsel. <u>Belanger</u>, 890 F.3d at 27 ("individual defendants in a joint criminal trial are required to raise their own objections unless the district court 'specifically states that an objection from one defendant will be considered an objection for all defendants'" (citation omitted)).